

**FILE**

IN CLERKS OFFICE

SUPREME COURT, STATE OF WASHINGTON

DATE  DEC 1 8 2014

CHIEF JUSTICE

This opinion was filed for record
at 8:00 Am on Dec. 18, 2014

Ronald R. Carpenter
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

|  |  |
|---|---|
| STATE OF WASHINGTON, ) <br> ) <br> Respondent, ) <br> ) <br> v. ) <br> ) <br> ADONIJAH LACROY SYKES, ) <br> ) <br> Petitioner. ) <br> ――――――――――――――――― ) <br> ) <br> STATE OF WASHINGTON, ) <br> ) <br> Respondent, ) <br> ) <br> v. ) <br> ) <br> ADONIJAH LACROY SYKES, ) <br> ) <br> Petitioner. ) <br> ――――――――――――――――― ) | No. 87946-0 <br> (Consolidated with 87947-8) <br><br><br> EN BANC <br><br><br> Filed: DEC 1 8 2014 |

FAIRHURST, J.—Many Washington counties have established drug courts designed to address and treat the underlying drug-related problems of certain adult criminal defendants. Most, but not all, adult drug courts hold closed meetings,

usually called staffings, where the drug court judge, attorneys, and treatment professionals meet to discuss each drug court participant's progress. Following staffings, the drug court judge holds review hearings in open court, recounts the issues discussed at the staffing, receives the participant's input, and then makes a decision as to the appropriate next steps in each participant's case. We must determine whether the open courts provision of article I, section 10 of the Washington Constitution[1] requires adult drug court staffings to be presumptively open. We affirm the trial court's holding that it does not.

## I.    FACTUAL AND PROCEDURAL HISTORY

In two separate King County Superior Court cause numbers, petitioner Adonijah Sykes was charged with three violations of the Uniform Controlled Substances Act, chapter 69.50 RCW. Sykes successfully petitioned to participate in the King County adult drug diversion court and entered drug diversion court waivers and agreements with the State. Sykes participated in the drug diversion court program for over a year but had difficulties complying with its requirements. The State eventually moved to terminate her from the program.

Sykes then moved to rescind the drug diversion court waivers and agreements and to vacate the orders granting her petitions to participate, arguing that King County's practice of holding closed staffings prior to holding open review hearings

---

[1]"Justice in all cases shall be administered openly, and without unnecessary delay."

2

violates article I, section 10 of the Washington Constitution. The closed staffings tainted all procedures that followed, Sykes argued, so she must be allowed to rescind all agreements, restore her full trial rights as to the underlying charges, and defend her cases as though she had never participated in drug diversion court. The State agreed that closed staffings violate article I, section 10 and chose not to assert invited error in order to have the underlying issue resolved on its merits.

The drug diversion court denied Sykes' motions, holding that presumptively closed adult drug court staffings do not violate article I, section 10. The court did not reach the merits of the State's motion to terminate. We granted direct review and accepted briefing from amicus Washington State Association of Drug Court Professionals (WSADCP).

## II.  ISSUE

Under article I, section 10 of the Washington Constitution, must adult drug court staffings be presumptively open to the public?[2]

## III.  ANALYSIS

Adult drug courts are philosophically, functionally, and intentionally different from ordinary criminal courts. Based on their unique characteristics, we hold that adult drug court staffings are not subject to the open courts provision of article I,

---

[2]We do not consider any other type of therapeutic, specialty, or problem-solving court. We do not consider if or how our analysis might differ under article I, section 22 of the Washington Constitution and the Sixth and Fourteenth Amendments to the United States Constitution.

section 10. Whether adult drug court staffings are presumptively open or closed is left to the discretion of the individual drug courts.

A.    Adult drug courts in context

Ordinarily, an adult who is found guilty of criminal activity is subject to penalties that are intended to protect the public by deterring criminal conduct and incapacitating those who engage in it. *State v. Nelson*, 108 Wn.2d 491, 504, 740 P.2d 835 (1987). In the case of certain adults who commit nonviolent offenses motivated by drug abuse or dependence, however, ordinary criminal penalties can be ineffective because they do not address the offenders' underlying drug issues, leaving them highly likely to recidivate after a brief period of incapacitation at public expense. Vickie Baumbach, *The Operational Procedure of Drug Court: Netting Positive Results*, 14 TRINITY L. REV. 97, 97-99 (2007). Adult drug courts are a judicial response to this problem and its enormous fiscal and societal costs. *Id.*

King County's adult drug diversion court was started in 1994. KING COUNTY DRUG DIVERSION COURT POLICY AND PROCEDURE MANUAL, at 3 (2013) (DRUG COURT MANUAL), *available at* http://www.kingcounty.gov/~/media/courts/drug Court/documents/DrugCourtPolicyProceduresManual.ashx. An adult criminal defendant must petition for entry into the drug diversion court program, and the petition is granted only if both the prosecuting attorney and judicial officer agree that the defendant is eligible for and would likely benefit from participating in the

program. *Id.* at 7. If the defendant's petition is granted, the defendant enters an agreement with the State and becomes an official drug court participant. *Id.* at 11. The participant agrees to waive a number of constitutional rights (including the rights to a public trial by jury, to remain silent and to testify, and to present evidence and witnesses) and to abide by the rules of the drug diversion court. Clerk's Papers (CP) at 18-19, 24-25.[3]

The adult drug court team, consisting of a judicial officer, a prosecuting attorney, a defense attorney, and a drug court case manager, regularly meet in closed staffings. DRUG COURT MANUAL, *supra*, at 5. The participant and the public are not invited or permitted to attend, and the staffings are not recorded or transcribed. CP at 9, 56. At the staffings, the attorneys and case manager discuss issues relevant to the participant's compliance or noncompliance with the program and make recommendations as to what the court should do at the next review hearing. DRUG COURT MANUAL, *supra*, at 5. The judge facilitates the discussion and may ask questions. *Id.*

Staffings are followed by review hearings in open court, which the participant must attend. *Id.* at 13. At the review hearings, the drug diversion court judge recounts

---

[3]King County's standard waiver and agreement was revised after the time relevant to this case, and the new form now specifically includes the drug court participant's consent to closed staffings. Drug Diversion Court Waiver and Agreement at 5, *available at* http://www.kingcounty.gov/~/media/courts/drugCourt/documents/Drug_Court_Waiver_and_Agr eement.ashx (last visited Dec. 12, 2014). The effect of this revision, if any, is not before us.

what was discussed at staffing, converses with the participant directly, and then makes a final decision on the record, either rewarding the participant for his or her progress or sanctioning the participant for his or her violations. *Id.*

If the participant completes all the drug diversion court requirements, he or she will graduate from the program and the State will dismiss the charges. *Id.* at 15. If the participant violates the rules or does not fulfill the requirements, he or she may be sanctioned and eventually subject to involuntary termination from the program. *Id.* at 14. Involuntary terminations are governed by traditional motion practice and must be supported by evidence on the record. *Id.* at 16. If the participant is terminated from the drug diversion court program, the case goes to a bench trial. *Id.* The bench trial judge renders a verdict based on the State's evidence and sentences the defendant as appropriate. *Id.*

In 1999, the legislature explicitly provided that jurisdictions in Washington "may establish and operate drug courts." RCW 2.28.170(1). This statute leaves most of the decisions about how drug courts operate to the individual jurisdictions, setting only certain minimum requirements for those jurisdictions seeking state funding. RCW 2.28.170(3). Twenty-three Washington counties currently operate adult drug courts. Washington State Courts, Drug Courts & Other Therapeutic Courts, http://www.courts.wa.gov/court_dir/?fa=court_dir.psc (last visited Dec. 12, 2014).

B.    Article I, section 10 does not apply to adult drug court staffings

The experience and logic test guides our analysis. *In re Det. of Morgan*, 180 Wn.2d 312, 325 & n.1, 330 P.3d 774 (2014). Our review is de novo. *In re Det. of D.F.F.*, 172 Wn.2d 37, 41, 256 P.3d 357 (2011). In light of the particular history, purposes, and functions of adult drug courts, the open courts provision of article I, section 10 does not apply to adult drug court staffings.

1.    Experience does not favor presumptively open staffings

We first look to experience and determine "'whether the place and process have historically been open to the press and general public.'" *State v. Sublett*, 176 Wn.2d 58, 73, 292 P.3d 715 (2012) (C. Johnson, J., lead opinion) (quoting *Press-Enter. Co. v. Super. Ct.*, 478 U.S. 1, 8, 106 S. Ct. 2735, 92 L. Ed. 2d 1 (1986)). Adult drug courts are a relatively new phenomenon, so we may consider analogous traditional procedures to the extent they help our analysis. *See Morgan*, 180 Wn.2d at 326. Certain traditional procedures have some resemblance to adult drug court staffings, but none is a perfect analog, and different analogies point in different directions. We therefore rely on the overwhelming weight of experience in the specific context of adult drug courts and conclude that staffings have not historically been open.

Sykes and the State analogize drug court staffings to briefing and materials filed in pretrial motions, which are presumptively open where they form a part of

the court's decision making process. *Bennett v. Smith Bundy Berman Britton, PS*, 176 Wn.2d 303, 308-10, 291 P.3d 886 (2013). This analogy has some force to it—in both adult drug court staffings and motions briefing, the information provided brings focus to the issues presented, establishes which facts are and are not disputed, and prepares the judge for a decision. This analogy points toward a presumption of openness. However, in traditional motions practice, the parties seek different results, while in properly functioning adult drug courts, everyone has the same goal—the participant's successful completion of the program. We therefore also consider situations involving shared, rather than competing, objectives.

WSADCP offers many analogies, but the most persuasive is its analogy to conferences held pursuant to CR 16 (or their criminal counterparts, as contemplated by CrR 4.5(c)(v)). At such conferences, the attorneys and a trial court judge meet with the shared goals of simplifying the issues, determining what facts are disputed, and addressing any other issues "as may aid in the disposition of the action." CR 16(a)(5). These conferences are not recorded, transcribed, or held in open court and are instead memorialized in the record by an order that recites what occurred and what agreements were reached. CR 16(b); *Morgan*, 180 Wn.2d at 326. This analogy indicates adult drug court staffings need not be presumed open. However, a CR 16 conference cannot result in a binding order on a contested issue. *Wilson v. Lund*, 74 Wn.2d 945, 949, 447 P.2d 718 (1968). In the adult drug court context, the judge must

reach a decision at the review hearing, regardless of whether the attorneys, case manager, and participant all agree.

In light of the distinguishability of the analogies offered and the fact that they point in different directions, we look to the history of adult drug courts themselves. Since the first drug court began operation in 1989, it is undisputed that both nationally and in this state, the far more common (but not universal) practice is to hold closed staffings in a procedure similar to that used by King County. *E.g.*, NAT'L DRUG COURT INST., THE DRUG COURT JUDICIAL BENCHBOOK at 40, 198 (Douglas B. Marlowe & Judge William G. Meyer eds., 2011) (NDCI *Judicial Benchbook*), *available at* http://www.ndci.org/sites/default/files/nadcp/14146-NDCI-Benchbook -v6.pdf, cited with approval at http://www.courts.wa.gov/court_dir/?fa= court_dir. psc&tab=2 (last visited Dec. 12, 2014); *cf.* CJC 2.9(A)(1) (providing an exception to the bar on ex parte communications for "ex parte communication pursuant to a written policy or rule for a mental health court, drug court, or other therapeutic court"). We rely on the overwhelming weight of experience specific to adult drug courts to hold staffings have not historically been open to the press or the general public.

2. Logic does not favor presumptively open staffings

Turning to logic, we consider "'whether public access plays a significant positive role in the functioning of the particular process in question.'" *Sublett*, 176

Wn.2d at 73 (C. Johnson, J., lead opinion) (quoting *Press*, 478 U.S. at 8). The logic prong "allows the determining court to consider the actual proceeding at issue for what it is, without having to force every situation into predefined factors." *Id.*

The ultimate purposes of adult drug courts are to reduce recidivism and incarceration costs associated with nonviolent offenders whose crimes are motivated by underlying drug-related issues. Baumbach, *supra*, at 97-99. Those purposes are more likely to be fulfilled where participants actually graduate from the program. *Id.* at 109-10; Michael Tobin, *Participation of Defense Attorneys in Drug Courts*, VIII. DRUG CT. REV., no. 1, Summer 2012 at 96, 101-02 & nn.14, 18, *available at* http://www.ndci.org/sites/default/files/nadcp/DCR_best-practices-in-drug-courts.pdf.

A participant is more likely to graduate from an adult drug court program where he or she is able to converse with the adult drug court judge directly and take an active role in his or her own recovery. Baumbach, *supra*, at 118; Paul Holland, *Lawyering and Learning in Problem-Solving Courts*, 34 WASH. U. J. L. & POL'Y 185, 207 (2010); Christine A. Saum et al., *Drug Court Participants' Satisfaction with Treatment and the Court Experience*, IV. DRUG CT. REV., no. 1, Summer 2002, at 39, 56-57, 61-62, *available at* http://www.ndci.org/sites/default/files/ndci/DCI%20_4_1.pdf (finding that adult drug court graduates overwhelmingly indicated direct contact with the judge was helpful to them, and about half of those who did

not successfully complete adult drug court felt they would have benefitted from more judicial contact).

A participant's direct connection with the judge and active participation in recovery are promoted where the drug court team members work collaboratively amongst themselves, both in fact and in appearance. Holland, *supra*, at 195 (noting drug court judges place "an emphasis on projecting a message rather than reaching a decision"); Tobin, *supra*, at 99 & n.9 ("If the court is operating fairly and effectively, the participants view the Drug Court as collaborative, rather than as adversarial."). In an adversarial setting, the adult drug court participant's perception of the process is filtered through the arguments of the drug court team members, cutting into the direct connection the participant has with the judge and reducing the participant's role in his or her own recovery. At a minimum, the participant's chances for success will not be promoted, and in many cases, it may be harmed. Tobin, *supra*, at 116 & nn.56-58. Even critics acknowledge the importance of actual and apparent collaboration in the adult drug court framework. Morris B. Hoffman, *Therapeutic Jurisprudence, Neo-Rehabilitationism, and Judicial Collectivism: The Least Dangerous Branch Becomes Most Dangerous*, 29 FORDHAM URB. L. J. 2063, 2068, 2088, 2093 (2002) (arguing that this collaborative approach, key to the drug court framework generally, is fundamentally inappropriate for the judiciary).

We cannot say factually what effect presumptively open staffings would have on actual collaboration by the adult drug court team. We can say though, as a matter of logic, that public access to staffings does not benefit the appearance of collaboration. Where there are issues of genuine contention among the members of the adult drug court team (regarding either matters of fact or appropriate consequences), presumptively closed staffings allow those issues to be discussed, explored, and even argued without affecting the team's collaborative appearance. In presumptively open staffings, all issues must be addressed in open court, including any arguments the team members might have regarding issues of genuine contention. At that point, the drug court team members start to look like individuals presenting opposing arguments to a neutral decision maker—that is, advocates in ordinary adversarial proceedings. Adult drug courts were explicitly designed to remove the individuals who participate in the adult drug court from ordinary adversarial proceedings because ordinary proceedings proved ineffective.

Public access to staffings interferes with a key feature—the appearance and fact of collaboration—that differentiates adult drug courts from ordinary criminal adjudications. Public access to staffings therefore does not play a significant positive role in adult drug court functioning.

## IV. CONCLUSION

Article I, section 10 of the Washington Constitution does not require adult drug court staffings to be presumptively open. We remand to the trial court for further proceedings consistent with this opinion.

Fairhurst, J.

WE CONCUR:

Wiggins, J.

González, J.

Penoyar, J.P.T.

*State v. Sykes (Adonijah LaCroy)*
  (consol. w/*State v. Sykes (Adonijah LaCroy)*)

No. 87946-0
(consol. w/No. 87947-8)

MADSEN, C.J. (dissenting in part)—The majority concludes that the open court provisions of article I, section 10 of the Washington Constitution do not apply to adult drug court staffings. I disagree and therefore dissent; but I would further hold that under the circumstances of this case the invited error doctrine bars the defendant from asserting a public trial right violation under article I, section 10.[1]

Discussion

Article I, section 10 of the Washington Constitution provides, "Justice in all cases shall be administered openly, and without unnecessary delay." "We have recognized that, 'by its terms,' article I, section 10 'is not limited to trials but includes *all judicial proceedings.*'" *Mills v. W. Wash. Univ.*, 170 Wn.2d 903, 913-14, 246 P.3d 1254 (2011)

---

[1] This court will generally decline to address issues not raised in the parties' petition and answer. *See* RAP 13.7(b); *Blaney v. Int'l Ass'n of Machinists & Aerospace Workers, Dist. No. 160*, 151 Wn.2d 203, 213, 87 P.3d 757 (2004). Here the trial court's order on review addressed only Washington Constitution article I, section 10, as did Sykes's motion for discretionary review. *See* Clerk's Paper's (CP) at 165 (trial court's RAP 2.3(b)(4) certification); Mot. for Discretionary Review at 1, 2, 6. Accordingly, we should decline to address Sykes's arguments regarding Washington Constitution article I, section 22 raised in her subsequent briefing as improperly and untimely raised. `

(emphasis added) (quoting *Federated Publ'ns, Inc. v. Kurtz*, 94 Wn.2d 51, 60, 615 P.2d 440 (1980)).

During the drug court staffings at issue here, a superior court judge presides over these scheduled proceedings, during which allegations and evidence of a defendant's treatment compliance, criminal law violations, and behavior are routinely presented and discussed. The parties and case manager may present different positions on these matters. The judge is in charge of making a decision when consensus cannot be reached. The judge will frequently notify the parties of his or her preliminary thoughts on changes to the defendant's treatment plan that will be ordered or sanctions the court is considering. The staffings form the basis for what is done at the review hearings and, ultimately, inform what happens in the event the case manager or the prosecutor requests a defendant be terminated from the drug court program. "During the team meetings [staffings], the DDC [(drug diversion court)] team strives to reach consensus on the next course of action for each DDC participant. If consensus cannot be reached, the judge makes the final decisions based on collaborative team input. In the courtroom the team presents a united front." Clerk's Papers (CP) at 71. In other words, information is gathered, viewpoints are vetted, decisions are made, and conflicts are resolved in the staffings, which are run by a drug court judge who resolves any conflicts. While orders are later formally entered during the subsequent court proceedings, it is clear that the process of decision-making and issue resolution occurs in the staffings. Accordingly, the

2

drug court staffings at issue can fairly be characterized as judicial proceedings and on this basis alone they are subject to the command of article I, section 10.[2]

Further, under article I, section 10, "the public must—absent any overriding interest—be afforded the ability to witness *the complete judicial proceeding*, including *all records the court has considered* in making *any* ruling, whether 'dispositive' or not." *Rufer v. Abbott Labs.*, 154 Wn.2d 530, 549, 114 P.3d 1182 (2005) (first and second emphasis added). Documents considered by the court in reaching its decision must be open in order to assure the public that courts are operating fairly and appropriately. *State v. McEnroe*, 174 Wn.2d 795, 807, 279 P.3d 861 (2012) (citing *Dreiling v. Jain*, 151 Wn.2d 900, 908-09, 93 P.3d 861 (2004) ; *Rufer*, 154 Wn.2d at 549). "[M]aterial relevant to a decision or other conduct of a judge or the judiciary is subject to a presumption of public access under article I, section 10." *Bennett v. Smith Bundy Berman Britton, PS*, 176 Wn.2d 303, 312, 291 P.3d 886 (2013) (Chambers, J., lead opinion).

The fact that the staffings are preliminary to the subsequent open court hearings does not insulate them from the presumption of openness contained in article I, section 10. Because the drug court judge relies on information and materials presented at the

---

[2] While the drug court staffings are intended to be more collaborative than typical criminal proceedings, they still occur in the context of the adjudication of a criminal case, where the parties are adverse in that treatment is coerced under threat of prosecution. If the defendant fails to meet program requirements, he will be sentenced for crimes. The drug court handbook makes this clear to participants: "If defendants meet the requirements of each of the four phases of DDC, they graduate from the program and the charges are dismissed. *If defendants fail to make progress they are terminated from the program and sentenced on their original charge.*" CP at 69 (emphasis added).

staffings in reaching decisions that are formally entered in the subsequent open court proceedings, the presumption of openness applies to the staffings.

Moreover, scrutiny by the public acts as an effective check on both the conduct of judges and the power of the courts. *See Bennett*, 176 Wn.2d at 310 (Chambers, J., lead opinion); *see also State v. Lormor*, 172 Wn.2d 85, 90, 257 P.3d 624 (2011) ("strong presumption that courts are to be open at all trial stages"). The presumption of open proceedings is grounded in the notion that judges and other participants "'will perform their respective functions more responsibly in an open court than in secret proceedings.'" *State v. Wise*, 176 Wn.2d 1, 17, 288 P.3d 1113 (2012) (quoting *Waller v. Georgia*, 467 U.S. 39, 46 n.4, 104 S. Ct. 2210, 81 L. Ed. 2d 31 (1984)). This is no less true for the closed drug court staffings at issue here.

In *Sublett*, this court adopted the "experience and logic test" to determine whether the public trial right applies to a particular proceeding. *State v. Sublett*, 176 Wn.2d 58, 73, 292 P.3d 715 (2012).[3] Applying this test, the majority concludes that article I, section 10's presumption of openness does not apply to drug court staffings. I disagree. As to

---

[3] This court explained,

> The first part of the test, the experience prong, asks "whether the place and process have historically been open to the press and general public." The logic prong asks "whether public access plays a significant positive role in the functioning of the particular process in question." If the answer to both is yes, the public trial right attaches and the *Waller* or *Bone-Club* factors must be considered before the proceeding may be closed to the public.

*Sublett*, 176 Wn.2d at 73 (citations omitted). In *Sublett*, this court addressed whether a trial court's response to jury questions regarding the jury instructions implicated the right to a public trial; this court concluded that such proceedings do not satisfy the experience prong of the experience and logic test because courts have not traditionally considered jury questions in open court and because the logic requiring openness did not apply to such proceedings. *Id* at 76-77.

4

the first prong, the majority concludes that the "overwhelming weight of experience" specific to adult drug courts indicates that staffings have not historically been open proceedings. Majority at 9. But the majority recognizes that application of the experience prong is difficult to apply in this case because drug courts do not have a long history and thus analogizing to other comparable proceedings is appropriate. *Id.* at 7. Failing to find an analogy that the majority found convincing, the majority returned to and relied upon the history of the drug court itself. *Id.* at 9. But relying on the limited drug court history of closed staffings to answer the experience prong inquiry begs the constitutional question.[4] The better approach is to analogize to comparables.

Here, guidance can be found in our recent decision in *State v. Chen,* 178 Wn.2d 350, 309 P.3d 410 (2013), which addressed the applicability of article I, section 10's presumption of openness to a competency evaluation considered by a trial court. There, this court held that a competency evaluation upon which the trial court relied in determining the defendant's competency to stand trial was subject to the constitutional presumption of openness, which can be rebutted only when the court makes an individualized finding that the *Ishikawa*[5] factors weigh in favor of sealing such document. *Id.* at 352.

*Chen* involved subject matter similar in relevant respects to the subject of litigation presented here. Both cases involved proceedings where the superior court was

---

[4] Moreover, the record indicates that closed staffings are not universal. The trial court here acknowledged that Pierce County does not close its drug court staffings. *See* Report of Proceedings (June 25, 2012) at 6.
[5] *Seattle Times Co. v. Ishikawa,* 97 Wn.2d 30, 37-39, 640 P.2d 716 (1982).

5

called upon to make decisions that would affect the rights and positions of parties. In both cases, the underlying proceedings and records would necessarily involve health and other private matters. In both, the trial court was responsible for ensuring that a person with a possible mental deficiency or comparable dependency or handicap was treated fairly and appropriately. This court in *Chen* held that the presumption of openness applied despite the possibly private nature of the inquiry.

The situation here is similar in the relevant constitutional respects. As noted above, article I, section 10 provides that "[j]ustice in all cases shall be administered openly." A defendant enters drug court as part of adjudicating a criminal *case* filed in a superior court of the state of Washington. The staffing is an integral part of drug court because it is where the greatest amount of information is shared between the parties and with the judge. The judge is intimately involved in this process, as the parties evaluate a participant's successes and failures in the program. The judge's rulings can reward success, correct missteps, or punish the participant's failures. Under these circumstances, the judge's involvement can fairly be characterized as the *administration* of justice in a *case* filed in a superior court. The judge's role in staffing—to participate, evaluate, and make decisions as needed—is akin to the role played by the judge in *Chen* regarding the preliminary competency determination. Accordingly, *Chen* by analogy suggests that the presumption of openness applies to the staffings at issue here.

Another of this court's recent decisions is instructive by way of contrast. In *State v. Beskurt*, 176 Wn.2d 441, 447-48, 293 P.3d 1159 (2013) (plurality decision), this court

concluded that no closure occurred where juror questionnaires were sealed but all

questioning, investigation, and decisions regarding the voir dire selection of the jury

panel occurred in open court. This court explained as follows:

> [T]he questionnaires provided the attorneys and court with a framework for [voir dire] questioning. In some instances, the court began by reiterating a prospective juror's questionnaire response and then asked that person to elaborate in open court. And in other instances, some jurors were not questioned at all from their written responses. Nothing suggests the questionnaires substituted for actual oral voir dire. Rather, the answers provided during oral questioning prompted, if at all, the attorneys' for-cause challenges, and the trial judge's decisions on those challenges all occurred in open court. The public had the opportunity to observe this dialogue. The [subsequent] sealing [of the questionnaires] had absolutely no effect on this process. The order [to seal] was entered after the fact and after voir dire occurred; it did not in any way turn an open proceeding into a closed one. Importantly, everything that was required to be done in open court was done. Therefore, we hold that no closure implicating [defendant's] public trial rights occurred.

*Id.* at 447-48. By contrast, in Sykes's case deliberations and decisions occurred in the

staffings and the results of those staffings were merely summarized and decisions

formally entered on the record in the following open court proceeding. The staffings

were an integral part of the drug court's decision making process and thus were

presumptively open. *See Chen*, 178 Wn.2d at 356 (court proceedings and records are

presumptively open and can be closed only when a trial court makes an individualized

finding that closure is justified).

As for the logic prong, the majority concludes that public access to staffings would

"not play a significant positive role in adult drug court functioning." Majority at 12. I

disagree. As noted, scrutiny by the public acts as an effective check on both the conduct

of judges and the power of the courts. *See Bennett*, 176 Wn.2d at 310 (Chambers, J., lead opinion); *see also Lormor*, 172 Wn.2d at 90 (strong presumption that courts are to be open at *all* trial stages). The presumption of open proceedings is grounded in the notion that judges and other participants will perform their respective functions more responsibly in an open court than in secret proceedings. *See Wise*, 176 Wn.2d at 17; *Waller*, 467 U.S. at 46 n.4. This is no less true for the closed drug court staffings at issue here. Indeed, community and family support are critical to success of the drug court model.

In *Chen* we reiterated the value of such openness in that public scrutiny encourages carefulness and ensures propriety. "[O]ur jurisprudence has treated court records and court proceedings similarly. . . . [C]ourt records and courtrooms are presumptively open and can be closed only when a trial court makes an individualized finding that closure is justified." *Chen*, 178 Wn.2d at 356. "[T]he *Ishikawa* factors must be considered in order to 'restrict access to court proceedings or records.'" *Id.* at 356 n.9. In *Chen*, this court explained:

> [T]he idea of a public check on the judicial process may be especially important where competency is at issue. If found to be incompetent, a defendant can have his or her freedom restricted for an undetermined amount of time without the full due process accorded in a criminal proceeding . . . . [C]ompetency determinations are a crucial turning point in the criminal process. . . . [S]hielding the evaluation from public view has the potential to implicate significant individual interests, as well as public concerns over the court proceedings.

*Id.* at 357. Similarly, in Sykes's case the staffings, at which occur evidence gathering, debate, and deliberations, and at which judicial decisions are formed, is a crucial juncture

8

in Sykes's criminal case and, thus, should be held under the watchful eye of public scrutiny. Accordingly, the logic prong of the *Sublett* test, likewise, suggests that these proceedings should be open. The public's interest in knowing how and why cases proceed through drug court is just as strong as its interest in knowing how cases move through the general criminal system, or through family court, or through any other judicial proceeding and process. Thus, public oversight is warranted.

For these reasons, *Sublett*'s "experience and logic" test supports applying article I, section 10's presumption of openness to drug court staffings.[6]

Turning to the question of remedy, Sykes requests that this court hold that the drug court staffings violated her right to open and public court proceedings and grant her an "appropriate remedy." Br. of Pet'r at 32. She contends that such remedy is vacation of the drug court agreements and restoration of her full jury trial rights or her return to phase two of the drug court program (i.e., allow her to start over in the drug court program with a clean slate). Sykes argues that because the closed proceedings cannot properly be used as a basis to terminate her from drug court, she should be allowed to start over in drug

---

[6] I see no valid basis for treating the staffings here differently than any other discrete portion of a case that is a judicial proceeding before the superior court at which information is gathered, viewpoints are vetted, and a trial judge decides issues that the parties cannot agree on. In this sense, the staffings here share key similarities with sentencing hearings, to which the presumption of openness applies. *See Lormor*, 172 Wn.2d at 90 (strong presumption that courts are to be open at *all* trial stages).

Furthermore, the fact that the staffings may involve Sykes's private information does not alter the presumption of openness. Even in voir dire, where the privacy interests of nonparty jurors is at issue, the presumption of openness still applies. *See State v. Duckett*, 141 Wn. App. 797, 808, 173 P.3d 948 (2007) (recognizing that the presumption of open proceedings applies to voir dire despite the privacy interests of jurors), *review denied*, 176 Wn.2d 1031 (2013). Because the presumption of openness applies to judicial proceedings such as sentencing and voir dire, it surely applies to the staffings here as well.

9

court with a clean slate. *Id.* at 32-33; *see Chen,* 178 Wn.2d at 356 ("court records and courtrooms are presumptively open and can be closed only when a trial court makes an individualized finding that closure is justified"). The State agrees. Br. of Resp't at 19. I do not. In my view, Sykes is barred from asserting any article I, section 10 public trial right claim by the doctrine of invited error.[7]

Under the invited error doctrine, a court should decline to review a claimed error if the appealing party induced the court to err. *State v. Henderson,* 114 Wn.2d 867, 870, 792 P.2d 514 (1990). The invited error doctrine "prohibits a party from setting up an error at trial and then complaining of it on appeal." *Id.* (internal quotation marks omitted). "Even where constitutional rights are involved, invited error precludes appellate review." *Id.* at 871 (internal quotation marks omitted). *State v. McLoyd,* 87 Wn. App. 66, 70, 939 P.2d 1255 (1997) (invited error doctrine applies even to manifest constitutional errors).

Here, Sykes signed a written waiver and agreement when she entered the drug court program, which expressly waived her public trial right. She further expressly agreed that "this agreement is binding on me and I cannot change my mind." CP at 26. Thereafter, Sykes not only acquiesced to the closed staffings, her counsel actively

---

[7]The State notes that it has not argued invited error because it wants a decision from this court on the open courts issue. Br. of Resp't at 2 n.1, 19. I would decide the specific issue presented as discussed above. However, the appropriate analysis does not end there. This court retains "'the inherent discretionary authority to reach issues not briefed by the parties if those issues are necessary for decision.'" *Blaney,* 151 Wn.2d at 213 (quoting *City of Seattle v. McCready,* 123 Wn.2d 260, 269, 868 P.2d 134 (1994)). This is such a case. As discussed herein, in my view Sykes is precluded from raising a public trial right challenge based on her express waiver and the invited error doctrine.

participated in those staffings.[8] She did not complain about the staffings in any fashion

until she failed to comply with her treatment requirements and the State sought

revocation.[9] Under these circumstances, in my view, Sykes invited the error and, thus, is

precluded from asserting her public trial right challenge.

I dissent in part.

---

[8] Similar to the defendant in *State v. Momah*, 167 Wn.2d 140, 156, 217 P.3d 321 (2009), Sykes here affirmatively accepted the closure, actively participated in it, and sought benefit from it. We may consider Sykes's tactical choices and apply the basic premise of the invited error doctrine to determine what, if any, relief should be granted. *Id.* at 154. Like the defendant in *Momah*, Sykes's actions foreclose the remedy she seeks. *See id.* at 156.

[9] *Cf. State v. Rinkes*, 70 Wn.2d 854, 859, 425 P.2d 658 (1967) ("The general rule is that one cannot voluntarily elect to submit his case to the jury and then, after an adverse verdict, claim error which, if it did exist, could have been cured or otherwise ameliorated by some action on the part of the trial court.").

Madsen, C.J.

No. 87946-0
(consol. w/ No. 87947-8)

GORDON McCLOUD, J. (dissenting)—I agree with every argument that the

majority has made about the value of informality, collegiality, and privacy in drug

courts. But we have not been asked to decide whether private drug court proceedings

further the goals of sobriety, public safety, and rehabilitation. Nor should we decide

those issues. Our court is not the ultimate expositor of pragmatics. Instead, our

court is the ultimate expositor of the rights protected by the state and United States

constitutions. I therefore respectfully disagree with what I believe is the underlying

logic of the majority's opinion: that because drug courts work, they are immune from

constitutional scrutiny. I join the partial dissent's conclusion that drug courts must

comply with our state constitutional right to an open courtroom. WASH. CONST. art.

I, § 10.

But I disagree with a different portion of the partial dissent. That portion

would immunize the drug court from constitutional scrutiny on the ground that Ms.

1

Sykes supposedly "invited" the courtroom closure at issue here. A close examination of the facts of this case, however, shows that that is not correct.

The partial dissent is correct that Sykes signed a waiver agreement when she entered into the drug court program. But the partial dissent errs in concluding that this agreement waived Sykes' right to public drug court proceedings. The waiver agreement that Sykes signed did not address her right to public drug court proceedings at all. Instead, it waived her right "to a speedy and public *trial* by an impartial jury in the county where *the crime* is alleged to have been committed." Clerk's Papers (CP) at 18 ("Drug Diversion Court Waiver and Agreement") (emphasis added). It also waived various other rights that attach in a criminal prosecution, such as the right to remain silent and to cross-examine witnesses. *Id.* Sykes had these rights because the State charged her with three violations of the Uniform Controlled Substances Act, ch. 69.50 RCW. When she signed the agreement, Sykes waived her right to make the State prove those charges, or obtain her guilty plea, in accordance with constitutional due process protections. U.S. CONST. amend. V; WASH. CONST. art. I, § 3. But she did not agree to closed *drug court* proceedings.

Indeed, when she signed the waiver agreement, Sykes had no way of knowing that any drug court proceedings would be closed at all. The waiver agreement she signed provided that she was "responsible for obtaining"—apparently at some future date—"a Participant Handbook from the Court and for knowing **all** of the rules and procedures contained in it, including any future amendments of which I am provided written notice." CP at 19. This provision fatally undermines the theory that Sykes knowingly "invited" the constitutional error at issue in this case. Partial dissent at 10. Because I do not agree that Sykes invited this error, I would hold that she is entitled to relief.

## CONCLUSION

The constitution does not require the legislature and the counties to abandon the rehabilitative goal of drug courts. Nor does the constitution require drug rehabilitation to occur in public. The constitution instead requires that if the case is in court, it has to be public. But the case does not have to be in court for the legitimate goals of rehabilitative courts to work. There are other alternatives. We have complete diversion from certain criminal misdemeanor proceedings (with the carrot of dismissal of the case dependent on compliance with diversion conditions). *E.g.*, RCW 13.40.080 (authorizing juvenile court diversion). That could be

3

expanded to drug felonies. We have dispositional continuances of misdemeanor criminal proceedings (with the carrot of dismissal tied to compliance with the continuance conditions) in other cases.[1] That could be expanded to drug felonies.

We used to give judges the option to use diversion and similar proceedings in felony cases.[2] Indeed, there are many creative alternatives to incarceration for drug felonies that further public safety and rehabilitation without trampling the constitution. Private drug courts are just not one of them.

---

[1] RCW 10.05.010-.030 (authorizing deferred prosecution for misdemeanants and gross misdemeanants who allege that offense resulted from alcoholism, drug addiction, or mental problems for which person is in need of treatment).

[2] *See* WASH. STATE SUPERIOR CT. JUDGES' ASS'N, FACTORS AFFECTING JUDICIAL DISCRETION IN FELONY SENTENCING IN WASHINGTON STATE: A STUDY OF JUDICIAL ATTITUDES 10 (1971) ("The current state of the sentencing law in Washington puts total discretion on the judge to decide between prison or otherwise"), 68 (in determining whether to impose a term of incarceration, many judges "placed much importance on the rehabilitative programs available in the community").

_Gordon McCloud, J._

_Stephens, J._