

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

STATE OF WASHINGTON,  )
           )  No. 36088-1-III
    Respondent,   )
           )
   v.       )
           )  UNPUBLISHED OPINION
GAVIN DAVID WOLF,   )
           )
    Appellant.    )

  SIDDOWAY, J. — After being permitted to participate in Spokane County

therapeutic courts for three years in lieu of criminal prosecution, Gavin Wolf was

terminated from the court's program and convicted of six burglary and theft-related

charges. We reject Mr. Wolf's contention that he was denied due process at the hearing

at which his participation in mental health court was terminated and find no abuse of

discretion by the mental health court judge in granting a motion by the State that Mr.

Wolf wear waist restraints during the hearing. We affirm the conviction but grant Mr.

Wolf's request for *Ramirez*[1] relief from some of the terms of his judgment and sentence.

---

[1] *State v. Ramirez*, 191 Wn.2d 732, 426 P.3d 714 (2018).

FACTS AND PROCEDURAL BACKGROUND

In June 2014, Gavin Wolf was charged in Spokane County with one count of residential burglary, two counts of second degree theft, two counts of second degree identity theft, and one count of first degree trafficking in stolen property. He successfully applied for drug court in lieu of prosecution and in July 2015 signed a drug court waiver and agreement. After seven months in drug court, he transferred to mental health court, signing a mental health court waiver and agreement in March 2016. The agreements required Mr. Wolf to participate in treatment, to refrain from using or possessing drugs or alcohol, and to commit no new criminal law violations. They notified him of acts or omissions on his part that would subject him to termination from the therapeutic court programs. He agreed that if he was terminated from the therapeutic court program, he would proceed to a bench trial on the charges against him, and the court's decision would be based solely on the information in the underlying police reports.

As of January 2018, Mr. Wolf not only had not graduated from mental health court, he had committed numerous violations of his drug and mental health court agreements. He had been arrested for new crimes and had faced two hearings on whether his participation in mental health court should be terminated. At the second termination hearing, which took place in August 2017, the trial court told Mr. Wolf that "it would

2

only accept one hundred percent compliance."  Report of Proceedings (RP) at 34.[2]

In January 2018, Mr. Wolf was arrested for a new charge of second degree malicious mischief.  Based on Mr. Wolf's new arrest, the State sought and obtained a failure to comply warrant for mental health court.  He appeared with his lawyer before the mental health court judge on January 30.  The judge explained that "if you have a new arrest when you're in one of our therapy court programs, that violates the terms and conditions of the program . . . the warrants get issued which is why you are here today." RP at 4.  The judge continued:

> The purpose of today's hearing is so that I could describe that to you, tell you that's why you are here, what the warrants are, why you are being held.  And, of course, [your lawyer] and yourself, you can meet and go through that in more detail and he can talk to you about that.
> The next step for me today is . . . to set a hearing on these matters. So that was discussed this morning in staffing in terms of the timing.  And I was asked to set that out a ways, if you will.  And that hearing would be a termination hearing.
> So that is our normal course of procedure, if you will; somebody has a new arrest, we set these for a termination hearing.
> We're going to set this on March 13th at 11:00 a.m., so quite a ways out—essentially six weeks.

RP at 4-5.

At the time of the March 13 termination hearing, Mr. Wolf was still in custody and was brought to the courtroom by transport staff.  At the inception of the hearing, the

---

[2] Unless otherwise indicated, references to the report of proceedings are to the volume that includes proceedings taking place on January 30 and March 13, 2018.

3

judge observed that Mr. Wolf was in waist restraints. He asked the transport officer if there was a concern, "because obviously I would normally ask that he be uncuffed if we're going to conduct a hearing." RP at 13-14. The officer responded that he had received information the prior day that Mr. Wolf made statements to the effect that "he was anxious to see what was going to happen in court when the deputies tried to put his handcuffs back on him." RP at 14. Based on Mr. Wolf's charges and his mental health issues, the officer stated, "[W]e would request to keep him secure that way." *Id.* Immediately following the transport officer's request, the State made a motion joining in the request.

The judge invited Mr. Wolf's lawyer and Mr. Wolf to respond and both asked that the waist restraints be removed. Mr. Wolf personally added that he would like the transport officer to be "put on the stand and questioned so that if he lies about statements I made, he'll be charged with perjury." RP at 15.

After hearing from Mr. Wolf and his lawyer, the judge granted the transport officer's request, explaining that he had reviewed Mr. Wolf's file in preparation for the hearing and was aware of his history of criminal charges and his history in drug and mental health court. Among those charges were three charges of third degree assault against police and security officers taking place in August 2015 that Mr. Wolf was being allowed to attempt to resolve through his mental health court participation. The judge stated, "I can go into it in intricate detail if I need to—but I am making a record that I

4

have reviewed that, and based on the charges and, again, the record, I have those

concerns about aggression that have manifested itself in physical aggression." RP at 17.

The State memorialized the ruling in a written order that was signed by the judge.

Continuing the hearing, the trial court explained that its purpose was to determine

whether a termination should occur. He observed that the decision was solely his but that

the hearing had been preceded by a "staffing"—he had met and obtained input from a

group that included a representative of Pioneer Behavioral Health; Mr. Wolf's case

manager, John O'Neill; a representative of the Department of Corrections; a Dr.

Altshuler; the State; and Mr. Wolf's lawyer.[3] RP at 20.

Asked by the judge whether the parties were ready to proceed, the prosecutor

answered that she was, but Mr. Wolf's lawyer asked for more time, explaining that what

"really what brings us here today are some new charges," and Mr. Wolf had provided

him with the names of some persons who "could provide evidence that [Mr. Wolf] may

have been experiencing a psychotic state at the time that those matters happened."

RP at 21. He requested the opportunity to "interview and perhaps call people as

witnesses." *Id.* The judge denied the request, explaining that the purpose of the hearing

---

[3] The mental health court agreement signed by Mr. Wolf provided that "[t]he decision whether or not to terminate an individual from the Mental Health Court Program rests solely with the Mental Health Court Judge, guided by input from the Prosecuting Attorney, Department of Corrections, and/or Mr. O'Neill"—a list identified as being nonexclusive. Clerk's Papers (CP) at 14-15.

was to determine whether Mr. Wolf should be terminated from the program, not to litigate Mr. Wolf's criminal charges. The judge noted that the new charges, in cause no. 18-1-00566-4, had been assigned to a different department of the court, but in his capacity as mental health court judge he had been provided with a copy of the police report and a report that Mr. Wolf had been found competent to stand trial in that matter.

The judge proceeded to provide a history of Mr. Wolf's three years in the county's therapeutic courts system. It then heard from Mr. O'Neill, Mr. Wolf's attorney, and Mr. Wolf himself. Finally, the judge summarized the police report from Mr. Wolf's new charge of second degree malicious mischief. The new charge and re-arrest occurred because Mr. Wolf became angry and broke a window in his mother's car after she had offered him a ride. After observing that Mr. Wolf seemed to do better when he was in a controlled setting, the judge concluded that "[b]ased on . . . all the facts and circumstances, I will find that you are not appropriate for this program; or . . . the program is not appropriate for you." RP at 61. He terminated Mr. Wolf's participation. His written order terminating Mr. Wolf's participation included the judge's finding of a "[r]e-arrest during the treatment program." Clerk's Papers (CP) at 19.

Mr. Wolf was willing to have the mental health court judge preside at his stipulated facts trial, which took place the following month. He was found guilty as charged and was sentenced to a prison-based drug offender sentencing alternative. In

entering judgment, the trial court imposed three then-mandatory legal financial

obligations (LFOs) and ordered him to pay supervision costs and interest.  He appeals.

ANALYSIS

I.    MR. WOLF FAILS TO DEMONSTRATE A VIOLATION OF HIS RIGHT TO DUE PROCESS

Both the federal and state constitutions guarantee a criminal defendant the right to

due process of the law.  U.S. CONST. amend. XIV; WASH. CONST. art. I, § 3.  For parole

revocation decisions, the United States Supreme Court long ago identified some minimal

due process guarantees: written notice, disclosure to the parolee of evidence against him,

opportunity to be heard, right to confront adverse witnesses, a neutral decisionmaker, and

a written statement of evidence relied on and reasons for revoking parole.  *Morrissey v.*

*Brewer*, 408 U.S. 471, 488-89, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972).  Washington

decisions have held the guarantees to apply in analogous contexts.  *State v. Nelson*, 103

Wn.2d 760, 763, 697 P.2d 579 (1985) (sentence revocation); *In re Pers. Restraint of*

*Boone*, 103 Wn.2d 224, 231, 691 P.2d 964 (1984) (probation revocation); *State v.*

*Marino*, 100 Wn.2d 719, 725, 674 P.2d 171 (1984) (pretrial diversion agreement

revocation); *State v. Cassill-Skilton*, 122 Wn. App. 652, 653, 94 P.3d 407 (2004) (drug

court revocation).

Mr. Wolf contends that he was not provided with written notice of claimed

violations, the prosecution did not disclose the evidence it was relying on in seeking

termination, he was not permitted to call witnesses or present evidence, he was not given

7

the right to confront or cross-examine witnesses, he did not receive a decision from a neutral decisionmaker, the court did not require the prosecution to prove by a preponderance of the evidence that Mr. Wolf had violated his agreement, and it did not enter adequate written findings and conclusions. Br. of Appellant at 13-15.

A. RAP 2.5(a)'s application in the therapeutic court context

The State argues that, at most, only the refusal to grant a continuance in order to arrange for witnesses was raised in the trial court. It asks that we refuse to review Mr. Wolf's claims of other due process violations. RAP 2.5(a) states the general rule that we do not review error that was not brought to the attention of the trial court. The State acknowledges that RAP 2.5(a)(3) creates an exception for manifest constitutional error and that a violation of due process would be constitutional error, but it argues that none of the alleged, unpreserved errors is manifest.

"'Manifest' in RAP 2.5(a)(3) requires a showing of actual prejudice." *State v. Kirkman*, 159 Wn.2d 918, 935, 155 P.3d 125 (2007). "To demonstrate actual prejudice, there must be a 'plausible showing by the [appellant] that the asserted error had practical and identifiable consequences in the trial of the case.'" *State v. O'Hara*, 167 Wn.2d 91, 99, 217 P.3d 756 (2009) (alteration in original) (quoting *Kirkman*, 159 Wn.2d at 935)). For the asserted error to be identifiable, the "record must be sufficient to determine the merits of the claim" and "'[i]f the facts necessary to adjudicate the claimed error are not

in the record on appeal, no actual prejudice is shown and the error is not manifest.'" *Id.* at 99 (quoting *State v. McFarland*, 127 Wn.2d 322, 333, 899 P.2d 1251 (1995)).

The protection or exercise of a constitutional right might not appear in the record on appeal either because it was protected in proceedings outside the record, or because the defendant never tried to exercise the right. Requiring that error be "manifest" spares us from speculating whether a constitutional right was violated based on nothing more than the fact that the record does not reflect its protection or exercise. The collaborative nature and partially-closed proceedings characteristic of therapeutic courts make it particularly unreasonable to assume that a right was violated just because its protection or exercise does not appear in the record on appeal.

In *State v. Sykes*, our Supreme Court recognized that therapeutic courts have "unique characteristics" that make them "philosophically, functionally, and intentionally different from ordinary criminal courts." 182 Wn.2d 168, 171, 339 P.3d 972 (2014). As the court explained, "[m]any Washington counties have established drug courts," and

> [m]ost, but not all, adult drug courts hold closed meetings, usually called staffings, where the drug court judge, attorneys, and treatment professionals meet to discuss each drug court participant's progress. Following staffings, the drug court judge holds review hearings in open court, recounts the issues discussed at the staffing, receives the participant's input, and then makes a decision as to the appropriate next steps in each participant's case.

*Id.* at 170. The Supreme Court held in *Sykes* that opening staffing meetings would not play a significant positive role in the functioning of drug courts, because "[a]

participant's direct connection with the judge and active participation in recovery are promoted where the drug court team members work collaboratively among themselves, both in fact and in appearance." *Id.* at 177. It quoted authorities on therapeutic courts as noting that drug court judges place "'an emphasis on projecting a message rather than reaching a decision,'" and, "'If the court is operating fairly and effectively, the participants view the Drug Court as collaborative, rather than as adversarial.'" *Id.*[4]

At Mr. Wolf's termination hearing, the mental health court judge provided a similar explanation of the purpose of staffing and disclosed that it had conducted a staffing that morning, which was attended by (among others) the prosecutor and Mr. Wolf's lawyer. The judge stated his intent to disclose what occurred at the staffing, stating, "there is certainly no secrets," and he proceeded to provide a summary, although not a blow-by-blow account, of what took place during the staffing. RP at 20. It is entirely possible that uncontested procedural matters might have been addressed during the staffing process. It is entirely possible that given the ongoing, collaborative, nonadversarial nature of the process, the purpose and the parameters of the termination hearing were mutually understood before it began.

---

[4] Paul Holland, *Lawyering and Learning in Problem-Solving Courts*, 34 WASH. U. J.L. & POL'Y 185, 207 (2010) and Michael Tobin, *Participation of Defense Attorneys in Drug Courts*, 8 DRUG CT. REV., no. 1, Summer 2012, at 96, 101-02 & nn.14 & 18, https://www.ndci.org/wp-content/uploads/DCR_best-practices-in-drug-courts.pdf [https://perma.cc/LP48-RJXV].

The "unique characteristics" of the collaborative and sometimes closed therapeutic court process adds to the importance that a claimed constitutional error either be objected to in the trial court or manifest in order to be entitled to review.

B.     The due process errors asserted on appeal are not manifest, or fail for other reasons

We review the alleged due process violations in turn.

*Failure to provide written notice of the claimed violations.*  Because Mr. Wolf did not assert in the trial court that he had not received notice, there was no need for anyone to demonstrate at the hearing that notice had been given.  The record *implies* that notice was given; the trial court stated at the hearing that "[w]e gave everyone notice of this hearing."  RP at 27.  Neither Mr. Wolf nor his lawyer disagreed.

Mr. Wolf's signed agreement stated that termination from the program could result from "[r]e-arrest during the treatment program."  CP at 14.[5]  On Friday, January 26, 2018, a deputy prosecutor applied for a bench warrant for Mr. Wolf, supported by a

---

[5] There are no local court rules dealing with proceedings in Spokane County therapeutic courts, nor does the county appear to have a policy and procedure manual for those courts of the sort in place in King County, cited in *Sykes.*  A mental health court "Participant Handbook" is available at the Spokane County website, on its Spokane Regional Mental Health Court page.  *See* https://www.spokanecounty.org /DocumentCenter View/626/SRMHC-Participant-Handbook-PDF?bidId= (2018) [https://perma.cc/9YJR-HF2S].  If the Participant Handbook is provided to offender participants and is known to and relied on by other staffing participants, including evidence of that fact in the clerk's papers could be helpful in future cases.  Such evidence is lacking here, so we place no reliance on the handbook.

declaration that he had failed to comply with mental health court conditions, having been arrested that day for second degree malicious mischief. A bench warrant was issued for the stated reason, and was returned with a report that Mr. Wolf was arrested that day. When Mr. Wolf was brought to court on the following Tuesday, with his lawyer in attendance, the mental health court judge, addressing Mr. Wolf, stated that the warrant issued

> would be a failure to comply warrant, if I'm understanding with the nature of them is, based upon a new arrest for malicious mischief DV.[6]
> So if you have a new arrest when you're in one of our therapy court programs, that violates the terms and conditions of the program, of course—obviously, I would assume. And as a result, the warrants get issued which is why you are here today.

RP at 4. The judge then provided the explanation and timing of the termination trial set forth above.

At the termination hearing, neither Mr. Wolf nor his lawyer questioned why the termination trial had been scheduled. His lawyer knew, since he stated, "Specifically, Your Honor, in talking about the matters that brought us here, really what brings us here today are some new charges." RP at 21. Mr. Wolf volunteered to the court that his lawyer "mentioned that the new charges are—why we're here today." RP at 23. The judge stated, "[J]ust to make sure you're clear, a re-arrest is a ground for termination." *Id.*

---

[6] Domestic violence.

Given these facts, an error, if any occurred, is not manifest.

*Failure to disclose evidence relied on for termination.* Mr. Wolf next argues that

the record does not show that "*the prosecution disclosed* what evidence [it] was relying

on in seeking termination." Br. of Appellant at 13 (emphasis added). *Morrissey* does not

require any particular type of disclosure *by the State*, only that the evidence against a

parolee be disclosed to the parolee. 408 U.S. at 489. During the termination hearing, the

mental health court judge conducted most of the proceedings, only occasionally inviting

the State to weigh in on particular matters. As demonstrated above, the record reveals

there was never any question that the State was seeking termination based on the new

arrest.

Here again, because nothing in the record suggests that Mr. Wolf and his lawyer

were unaware that the evidence of a program violation was his arrest for malicious

mischief, no manifest error is shown.

*Neutral decisionmaker.* *Morrissey* states that to satisfy its requirement for a

"neutral and detached" hearing officer in the parole revocation process, "It will be

sufficient . . . if an evaluation of whether reasonable cause exists to believe that

conditions of parole have been violated is made by someone such as a parole officer other

than the one who has made the report of parole violations or has recommended

revocation." 408 U.S. at 486. In the context of revocation of a minor's probation, this

13

court held in *In re Welfare of Ames*, 16 Wn. App. 239, 243, 554 P.2d 1084 (1976), that the requirement was satisfied by "a neutral and detached juvenile court judge or commissioner to conduct the proceedings."

Most questions concerning a judge's qualifications to hear a case are not constitutional ones, because the due process clause of the Fourteenth Amendment establishes a constitutional floor, not a uniform standard. *Bracy v. Gramley*, 520 U.S. 899, 904, 117 S. Ct. 1793, 138 L. Ed. 2d 97 (1997). The only authority cited by Mr. Wolf as supporting his contention that the mental health court judge was not a constitutionally neutral and detached decision maker is *In re Murchison*, 349 U.S. 133, 75 S. Ct. 623, 99 L. Ed. 942 (1955). In that case, the same judge who compelled two witnesses to appear before him in secret to testify about suspected crimes (a "one-man grand jury") issued orders to show cause why they should not be held in contempt for their conduct in those proceedings. He then tried both, and convicted and sentenced both for contempt. The Supreme Court found it would be "very strange if our system of law permitted a judge to act as a grand jury and then try the very persons accused as a result of his investigations." *Id.* at 137. It found Judge Murchison's dual role to be similarly objectionable.

Mr. Wolf complains that the mental health judge was a participant in the "staffing" that preceded the open hearing.[7] But the mental health court judge's participation in staffing is not like serving as a prosecutor. The judge has no need to serve as prosecutor during a staffing meeting, because the prosecutor is present and available to serve her or his role—as is the participant's defense lawyer. Mr. Wolf does not demonstrate that the mental health court judge was not neutral and detached.

*Burden of proof.* In *Marino*, our Supreme Court rejected a State argument that in reviewing a prosecutor's desire to terminate a diversion agreement, a trial court need only review the prosecutor's discretionary decision for reasonableness. 100 Wn.2d at 723. The court held that the offender is instead entitled to "an independent determination that the deferred prosecution agreement was violated, by a preponderance of the evidence with the burden of proof on the State." *Id.* at 725. It held that after finding a violation by the required burden of proof, the court's review of the prosecutor's decision to terminate the agreement in light of the violation "should consist of assessing its reasonableness in light of the facts the trial court determines at hearing." *Id.*

---

[7] Mr. Wolf also disrespectfully asserts that "the judge had plainly made up his mind prior to the hearing as to whether Mr. Wolf should be terminated." Br. of Appellant at 14. We would point out that the judge allowed the hearing to go on for an hour and a half and gave Mr. Wolf many opportunities to speak. *See* RP at 12, 65. While the judge may have been leaning one way or the other coming into the hearing (not an uncommon phenomenon where a judge has prepared by reviewing the file), we reject the suggestion that he did not meaningfully consider what he heard from Mr. Wolf and Mr. Wolf's lawyer.

Mr. Wolf complains that the mental health court judge did not announce that the preponderance standard applied or recite the standard in entering its findings. The *Marino* court would have preferred a clear statement of the standard that the trial court applied in that case because at the time—1984—the standard was unsettled and the parties had disputed the standard at the hearing. It nonetheless declined to remand the case for any findings "[i]n view of the essentially uncontroverted evidence." *Id.* at 727.

Because it has been settled in the 36 years since *Marino* that a violation of a diversion agreement (and by extension, a therapeutic court agreement) must be proved by a preponderance of the evidence, the mental health court judge was not required to recite that well-settled burden in its finding. We deem the *absence* of a finding as to a material fact as a finding by the appropriate burden against the party having the burden of proof. *E.g.*, *Eggert v. Vincent*, 44 Wn. App. 851, 723 P.2d 527 (1986). We deem the *entry* of a finding of material fact as a finding by the appropriate burden.

Mr. Wolf does not show, nor attempt to show, that the trial court failed to *apply* a preponderance of the evidence standard. It was apparently uncontroverted that Mr. Wolf had been re-arrested.

*Written findings and conclusions.* Mr. Wolf recognizes that the trial court's order terminating his participation based it on a finding of re-arrest. He complains, however, that the finding was cursory, and on a preprinted form. Termination will usually be for one of the succinctly-stated causes for termination spelled out in the therapeutic court

16

agreements, so there is nothing wrong with use of a preprinted form. Due process does not require findings that are prolix or original, it requires findings that can be reviewed. The trial court's finding that the violation triggering termination was a new arrest is sufficient for review.

*Opportunity to be heard and confront adverse witnesses.* Mr. Wolf complains that he was not given the opportunity to confront or cross-examine adverse witnesses where the judge read a police report, referred to notes he had made in reviewing the file, and relied on information received during the staffing. Mr. Wolf's lawyer had access to the police report and the court file and had been present at the staffings. (The mental health court agreement signed by Mr. Wolf stated that he, personally, waived his right to be present at court staffing meetings.) Mr. Wolf raised no confrontation clause objection in the trial court, so any confrontation clause violation was waived. *State v. Burns*, 193 Wn.2d 190, 211-12, 438 P.3d 1183 (2019).

As for the opportunity to be heard, the judge denied Mr. Wolf's lawyer's request for a continuance in order to interview and possibly later call witnesses who might be able to speak to Mr. Wolf's culpability for the new charge of malicious mischief. Whether to grant a continuance of a hearing is ordinarily a matter of discretion. *Trummel v. Mitchell*, 156 Wn.2d 653, 670-71, 131 P.3d 305 (2006). The judge explained that the purpose of the termination hearing was not to determine whether Mr. Wolf was guilty of malicious mischief. No abuse of discretion is shown.

There is no indication in the record that Mr. Wolf intended to call any witnesses at the March 13 hearing. He never tried to call a witness. If he wanted to present evidence beyond his own opportunity to speak and believed the judge was foreclosing that, he never objected. The judge did say during the course of the hearing that he was not conducting a trial, and that was true. He later stated, "this is not an evidentiary proceeding *in one sense*;" in context, he appears to have been saying that it was limited in scope to "determin[ing] whether policies and procedures within the Drug Court program have been violated such that a termination should occur." RP at 18 (emphasis added). Nothing in the record suggests that if Mr. Wolf had an available witness prepared to speak to a relevant issue, the judge would have refused to hear the testimony. And the judge heard from Mr. Wolf, himself, at length.

No violation of Mr. Wolf's due process rights is shown.

II.   THE TRIAL COURT CONDUCTED AN ADEQUATE HEARING BEFORE GRANTING THE STATE'S MOTION THAT MR. WOLF REMAIN IN WAIST RESTRAINTS

A trial court has a duty to provide for courtroom security, and measures needed to protect the safety of court officers, parties, and the public, are within the court's discretion. *State v. Hartzog*, 96 Wn.2d 383, 396, 635 P.2d 694 (1981). In exercising discretion, the trial court must bear in mind a defendant's right "to be brought before the court with the appearance, dignity, and self-respect of a free and innocent" individual. *State v. Finch*, 137 Wn.2d 792, 844, 975 P.2d 967 (1999). This includes a defendant's

right "to be brought into the presence of the court free from restraints." *State v. Damon*, 144 Wn.2d 686, 690, 25 P.3d 418 (2001). "[R]egardless of the nature of the court proceeding or whether a jury is present, it is particularly within the province of the trial court to determine whether and in what manner shackles or other restraints should be used." *State v. Walker*, 185 Wn. App. 790, 797, 344 P.3d 227 (2015).

Restraints should be allowed "only after conducting a hearing and entering findings into the record that are sufficient to justify their use on a particular defendant." *Id.* at 800. This court reviews a trial court's decision to keep a defendant restrained for abuse of discretion. *State v. Turner*, 143 Wn.2d 715, 724, 23 P.3d 499 (2001). "Discretion is abused when the trial court's decision is manifestly unreasonable, or is exercised on untenable grounds, or for untenable reasons." *State v. Blackwell*, 120 Wn.2d 822, 830, 845 P.2d 1017 (1993).

In this case, the reported threat made by Mr. Wolf was not to the judge himself, but to transport officers. The judge was presented with the transport officer's request, supported by a State motion that Mr. Wolf remain in the waist restraints. A transport officer explained that he brought Mr. Wolf to the hearing in waist restraints rather than handcuffs because waist restraints are less restrictive.

The judge heard argument from both lawyers and from Mr. Wolf himself before ruling on the State's motion. Mr. Wolf argues that the judge's consideration of the motion was inadequate, however, because "[t]he court did not hear testimony or receive

any sworn declarations." Br. of Appellant at 22. He provides no authority holding that either is required.

Mr. Wolf cites *Walker*, in which a declaration was submitted, but that case involved an exceptional situation in which a shackling situation was foreseen and a motion was made and responded to in advance. The factual support for the shackling was necessarily provided by declaration. The case does not hold that the declaration was required. This case presents the not-uncommon scenario of a potential for violence or disruption that is identified shortly before the hearing, and is not addressed by prehearing motions and supporting declarations.

Mr. Wolf also cites *In re Welfare of Ross*, 45 Wn.2d 654, 277 P.2d 335 (1954), in which the court held that in a juvenile court proceeding to terminate an individual's parental rights, the trial court should have honored a request that witnesses be sworn. The court added, however, "This statement is not to be tortured into a holding that all witnesses must be sworn in all juvenile court proceedings." *Id.* at 655. In discharging its obligation to decide a matter of court security, the court may solicit the input of participants without putting them under oath.

We also note that even if the trial court had erred by ordering that Mr. Wolf remain in waist restraints during the hour and a half hearing, the error was harmless beyond a reasonable doubt. "The likelihood of prejudice is significantly reduced in a proceeding without a jury." *State v. Lundstrom*, 6 Wn. App. 2d 388, 395 n.2, 429 P.3d

20

1116 (2018), *review denied*, 193 Wn.2d 1007, 443 P.3d 800 (2019); *State v. E.J.Y.*, 113

Wn. App. 940, 952, 55 P.3d 673 (2002).

III.    *RAMIREZ* RELIEF

Finally, Mr. Wolf asks us to remand this case to the trial court with instructions to

strike the criminal filing and DNA[8] collection fees imposed by his judgment and sentence

as well as the provisions requiring him to pay the costs of community custody and

accruing interest.  He relies on *Ramirez*, which held that legislation providing relief from

LFOs that became effective in June 2018 applies to cases then pending on direct review.

*Ramirez*, 191 Wn.2d at 747.

The trial court found Mr. Wolf indigent for purposes of appeal based on his

representation that he has no source of income, a form of indigency addressed by RCW

10.101.010(3)(c) that now exempts him from liability for discretionary LFOs and the

criminal filing fee.  *See* RCW 10.01.160(3) (discretionary LFOs); RCW 36.18.020(2)(h)

(criminal filing fee); *and see Lundstrom*, 6 Wn. App. 2d at  396 n.3 (costs of community

custody are discretionary LFOs, citing RCW 9.94A.703(2)(d)).  Mr. Wolf's judgment and

sentence includes a provision for interest accrual on nonrestitutionary LFOs, which is no

longer authorized.  *See* RCW 10.82.090(1).  He has been convicted of five Washington

---

[8] Deoxyribonucleic acid.

State felonies since 2002 making it likely that his DNA has previously been collected, which exempts him from liability for the DNA collection fee. RCW 43.43.7541.

The State agrees that we should direct the trial court to strike the challenged LFOs from Mr. Wolf's judgment and sentence. Striking the criminal filing and DNA collection fees and the costs of community custody and interest accrual provisions from Mr. Wolf's judgment and sentence is a ministerial correction that will not require Mr. Wolf's presence. *State v. Ramos*, 171 Wn.2d 46, 48-49, 246 P.3d 811 (2011); *State v. Phillips*, 6 Wn. App. 2d 651, 678, 431 P.3d 1056 (2018).

## STATEMENT OF ADDITIONAL GROUNDS

In a pro se statement of additional grounds, Mr. Wolf raises four. We address them in the order presented.

*Improper admission to mental health court program.* Mr. Wolf makes several arguments why he should not have been accepted into the mental health court program. He argues that the results of his stipulated facts trial should be set aside and he should be restored to his prewaiver and agreement status, with his constitutional rights restored.

To the extent Mr. Wolf is alleging nonconstitutional irregularities, he failed to preserve any error. RAP 2.5(a)(3).

Insofar as Mr. Wolf is now claiming that his waiver of rights upon entering into the mental health court program was not knowing, intelligent, and voluntary, we point out that he signed a mental health court agreement that included the right waivers, and

initialed its provision indicating that he understood the agreement.[9] At the hearing at which Mr. Wolf opted into mental health court, his attorney told the mental health court judge that he had reviewed the mental health court agreement with Mr. Wolf and was comfortable and confident that Mr. Wolf understood the nature of the rights he was giving up. The court then engaged in a colloquy with Mr. Wolf in which Mr. Wolf stated he understood everything in the documentation he had signed; as for giving up his legal rights, Mr. Wolf answered, "All the waivers, I understand them all." RP (June 11, 2015) at 7.

Any claim that his waivers were not knowing, intelligent, and voluntary must depend on evidence outside the record. If Mr. Wolf has evidence that would support such a claim, his remedy is to seek relief through a personal restraint petition. *See State v. Norman*, 61 Wn. App. 16, 27-28, 808 P.2d 1159 (1991).

*Burden of proof.* Mr. Wolf argues that the burden of proof at the termination hearing was improperly shifted from the State to him. The only relevant reference he

---

[9] The initialed provision states in its entirety:

I have read or had read to me this Waiver and Agreement and the Mental Health Court Termination Policy. No one has made any threats or other promises to cause me to agree with the State to submit to this agreement. My attorney has explained to me and we have fully discussed this Waiver and Agreement. I understand this Agreement and wish to enter into this Agreement. I have no further questions to ask the Court.

CP at 15.

makes to the record is to his own view, expressed to the court, that by terminating his participation because of an arrest, as opposed to a conviction, the burden of proof had been shifted. The only legal authority he cites is *Marino*, whose relevance was adequately addressed by counsel and will not be reviewed again. *See* RAP 10.10(a).

*Appearance of fairness*. Mr. Wolf argues that his termination hearing violated the appearance of fairness doctrine. "Like the protections of due process, Washington's appearance of fairness doctrine seeks to prevent the problem of a biased or potentially interested judge." *Tatham v. Rogers*, 170 Wn. App. 76, 95, 283 P.3d 583 (2012). An appearance of fairness objection is deemed waived when not raised in the trial court. *State v. Tolias*, 135 Wn.2d 133, 140, 954 P.2d 907 (1998) (citing *State v. Hoff*, 31 Wn. App. 809, 814, 644 P.2d 763 (1982)). Not only was no appearance of fairness issue raised in the trial court, but following the mental health court judge's termination decision, Mr. Wolf waived his right to have a different judge preside over his stipulated facts trial.

*Contested competency hearing*. Mr. Wolf argues that he was denied a contested competency hearing. The argument appears to be based on an issue raised during his stipulated facts trials in the two criminal cases that had been continued while he participated in mental health court. The record of those trials was not included in the record for this appeal.

24

The record of those trials is included in the record for a different appeal, Court of Appeals cause no. 36089-0-III (Wash. Ct. App. Feb. __, 2020), in which Mr. Wolf presents the same challenge. As more fully explained in our concurrent opinion in that matter, no issue of competency was ever raised in Mr. Wolf's prosecution for the charges at issue in this appeal. No issue of competency is within the scope of this appeal. *See* RAP 2.4(a), (b).

We affirm Mr. Wolf's convictions. We remand to the trial court with instructions to strike the criminal filing and DNA collection fees imposed by his judgment and sentence as well as the provisions requiring him to pay the costs of community custody and accruing interest.[10]

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____          _____
Lawrence-Berrey, C.J.                   Fearing, J.

_____

[10] Mr. Wolf's opening brief includes an assignment of error to cumulative error that we need not address, having found no error.