**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**


The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

Filed
Washington State
Court of Appeals
Division Two

December 12, 2023

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 57240-1-II |
| Respondent, | |
| v. | |
| KRISTOPHER SUYOUNG STARKGRAF, | PUBLISHED OPINION |
| Appellant. | |

GLASGOW, C.J. — After being charged with two counts of first degree trafficking in stolen property, Kristofer Starkgraf entered the Kitsap County Drug Court Program. While in the program, Starkgraf successfully completed drug and alcohol treatment and began attending community college.

After Starkgraf spent 40 months in the program, the State moved to terminate his participation. Following a hearing, the trial court found that Starkgraf had failed to continue making progress in treatment, filled a prescription for an opioid without prior permission from the drug court team, behaved disrespectfully to the drug court program in reaction to a mandatory holiday party, and stagnated in drug court by spending 40 months in a program that typically takes 2 years to complete. The trial court concluded there was sufficient cause to justify termination and the State's decision to seek termination was not unreasonable.

Starkgraf appeals. We conclude that the termination procedure did not violate Starkgraf's due process rights, substantial evidence supported the trial court's findings that he failed to continue making progress in treatment and stagnated in the program, and the trial court did not

No. 57240-1-II

abuse its discretion in concluding that termination was reasonable. Because the termination was amply supported by findings unrelated to Starkgraf's speech on social media about the holiday party, we need not reach his First Amendment arguments. We affirm.

FACTS

I. BACKGROUND AND PETITION TO ENTER DRUG COURT

In January 2018, the State charged Starkgraf with two counts of first degree trafficking in stolen property after he shoplifted gaming consoles and sold them to a pawn shop.[1] Around that time, Starkgraf was using heroin. Starkgraf petitioned to enter the Kitsap County Drug Court Program several months later. As therapeutic courts, drug courts handle "cases in ways that depart from traditional judicial processes," allowing defendants "to obtain treatment services to address particular issues that may have contributed to the conduct that led to their [arrests] . . . in exchange for resolution of the" charges. RCW 2.30.030(1).[2]

Starkgraf signed a set of stipulations and waivers, which the trial court accepted, as well as a petition that contained a series of 30 specific agreements that were conditions of participation in drug court.

In his petition, Starkgraf admitted that he was guilty of the charges and that his substance use disorder contributed to the charged conduct. He said he understood that if he were to graduate from the drug court program, the charges would be dismissed with prejudice, but if he were terminated from the program, he would be found guilty of the charges. Starkgraf also stipulated

---

[1] The State later charged Starkgraf with possession of a controlled substance. The trial court dismissed that charge pursuant to *State v. Blake*, 197 Wn.2d 170, 481 P.3d 521 (2021).
[2] We cite to the current statute as the relevant language from the 2015 version, which would have been in effect at the time of Starkgraf's sentencing, has not changed.

2

that the facts in the police reports about the shoplifting incident were "sufficient for a trier of fact to find [him] guilty" as charged. Clerk's Papers (CP) at 8.

The petition explained that the drug court program would last a minimum of 18 months, it would consist of 4 phases, and participants would need to complete all 4 phases "to be eligible for graduation." CP at 14. The petition listed drug court participants' responsibilities and agreements. Participants had to "be honest and forthright in all" their statements to the drug court team, therapists, and law enforcement. *Id.* Participants had to follow directives from their compliance specialists, treatment counselors, and any other drug court team members. If a participant were to "fail to continue making progress," that participant "could face termination for failing to engage in treatment." CP at 16.

Other agreements were more specific. Participants were forbidden from ingesting any type of alcoholic beverage and "any controlled substances," including "prescription drugs without a valid prescription and permission from the treatment staff." *Id.* Participants had to submit to regular drug testing and agree that urine samples with creatinine levels below a certain threshold would count as positive tests, as low levels can indicate that the person diluted their sample by quickly consuming liquid to avoid failing a drug test, although they can also indicate unrelated medical issues. Participants had to "refrain from using profanity," from making violent or offensive comments, from engaging in abusive, aggressive, or offensive behavior, and from using "insulting language." CP at 14. And if participants were to change jobs or home addresses, they had to inform their respective compliance specialists and treatment providers within 24 hours.

In a section on sanctions, the petition said that a participant who failed to follow the terms of the drug court agreements "or any directives given by a member of the drug court team" could face penalties, including termination from the program. CP at 17.

3

Starkgraf also signed an express waiver of several constitutional rights, including the right to a jury trial. The waiver did not mention free speech or any other First Amendment rights. But the specific agreements listed in the petition restricted exercise of several more constitutional rights. For example, Starkgraf agreed to searches of his residence, vehicle, and workplace; to drug testing; and to refrain from traveling outside the Kitsap Peninsula without permission.

The trial court found that Starkgraf understood "the documents and the rights he [was] waiving" and accepted Starkgraf's petition to enter drug court. Ex. 6.

## II. Termination from Drug Court

Starkgraf spent about three years and four months in the drug court program. While participating, Starkgraf successfully completed several phases of treatment, including detoxification, stabilization, and enrollment in an outpatient program. Starkgraf also attended community college, volunteered at food banks, and did volunteer conservation work. At one point, he "took a break from school and drove a taxi" to ensure he would be financially prepared for emergencies. Verbatim Rep. of Proc. (VRP) at 133.

Several events in the winter of 2021 led to Starkgraf's termination from the drug court program. In December, the program's alumni hosted a holiday party and raised funds to ensure participants' children would receive holiday gifts. Participants were required to attend "for socialization," "to support other participants," and to be "treated to a nice evening of food and fellowship and gift giving." VRP at 44.

In mid-December, Starkgraf first asked not to attend the holiday party because he was busy preparing for college exams. He then asked not to attend because he was not vaccinated against COVID-19 and did not feel safe. Starkgraf made several posts about the party on Facebook. He called for the drug court program to cancel the party, accusing the drug court team of trying to kill

4

participants by exposing them to COVID-19 and of accepting bribes in exchange for hosting the party. He sent an email with similar content to drug court team members. Finally, Starkgraf said he had a back injury. The drug court asked for a doctor's note, but Starkgraf refused, saying he did not have time to get one.

On the evening after the holiday party, Starkgraf told his compliance specialist that he had obtained a prescription for opiates to treat back pain without first getting permission, and he would fail his drug test as a result. Based on this and on Starkgraf's behavior surrounding the party, Starkgraf was remanded to jail as a sanction.

When Starkgraf left jail, he moved from the drug-free residence where he had been living to his parents' home. He did not report his address change, which the drug court program required. And in January 2022, Starkgraf's urine sample showed that his creatinine levels were too low to permit testing for the presence of drugs or alcohol.

A.     Termination Hearing

The drug court team decided to terminate Starkgraf's participation, and the team notified Starkgraf at a hearing on December 23, 2021.

In early January 2022, Starkgraf's attorney met with the prosecutor "to get a better understanding of . . . the allegations." VRP at 4. Starkgraf's attorney asked for the allegations in writing and asked whether the State would be filing a written termination motion. The prosecutor told Starkgraf's attorney that there would be no written motion and that "the allegations were mostly surrounding" the drug court program's holiday party. VRP at 5.

A judge who was not part of the drug court team presided over the drug court termination hearing. After several continuances, the trial court scheduled the drug court termination hearing for Monday, February 28, 2022. The Friday before the hearing, the State filed a written termination

motion. The motion alleged that Starkgraf broke drug court rules by failing "to continue making progress in treatment," failing to disclose his status as a drug court participant to a doctor, filling a prescription for a controlled substance without getting permission, being disrespectful to the drug court team and program, having a "high overall number of sanctions (23 separate sanctions)," and stagnating "in the program (40 months in an 18-month program)." CP at 35.

On Monday, February 28, the date set for the termination hearing, Starkgraf's attorney asked for a continuance so she could "properly investigate" the State's allegations "and have adequate time to speak" with Starkgraf about them. VRP at 6. She also said she had interviewed a witness who would be willing to testify, but they would not be available until a later date.

In response, the prosecutor asked that the case go forward. The prosecutor said she put the allegations in writing after coming across case law requiring her to do so, but the termination motion contained nothing new. She said she had provided Starkgraf's attorney "with voluminous documentation of" Starkgraf's time in drug court, including the documents she planned to rely on in making a case for termination. *Id.*

The trial court moved forward with the State's case that day and allowed Starkgraf to present his case the following week.

1.      Treatment court manager's testimony

The Kitsap County Superior Court treatment court manager, who also served as Starkgraf's compliance specialist, testified in the hearing. She discussed the drug court program in general, explaining that a single violation generally does not lead to termination. She also explained that the fastest a participant can complete the program is 18 months. She said it was "pretty rare" for participants to finish that quickly because they would have to commit no violations, and the

"ballpark average" length of time in the program was about two years. VRP at 15. At the time of the hearing, Starkgraf had been in the program for about three years and four months.

Next, the treatment court manager testified about the drug court program holiday party. She said Starkgraf, who was taking college finals at that time, "expressed that he had too much schoolwork . . . to attend." VRP at 44. She said Starkgraf also expressed concerns around attending while he was unvaccinated for COVID-19. And she added, "[W]hen I explained to him that that wasn't a reason [the drug court judge] was going to really entertain, then I heard about a very serious back problem that [Starkgraf] was having." *Id.* She told Starkgraf the judge would release him from the obligation if he got medical documentation stating that his back prevented him from participating, and Starkgraf said he did not have time to get that documentation and would not do it.

Starkgraf posted about the party on Facebook. Sharing a link to a webpage that allows Washington residents to report violations of COVID-19 regulations, Starkgraf wrote, "THEY ARE TRYING TO KILL GOOD PEOPLE WHO HAVE HEALTH COMPLICATIONS AND DESERVE THEIR LIFE." Ex. 13. Reposting the link, Starkgraf also wrote, "I BET SOMEONE IN THE SUPERIOR COURT SYSTEM GOT PAID OFF TO HOST THIS PARTY." *Id.* The treatment court manager testified that the party complied with Kitsap County regulations.

Starkgraf also reached out to the entire drug court team and "was begging [the treatment court manager] to not have this event take place." VRP at 46. On the morning of the party, Starkgraf emailed the treatment court manager, "This party is murder. . . . If you or anyone else on the team [has] been paid off to make this happen[,] please do the right thing." Ex. 13. The treatment court manager replied that because of Starkgraf's Facebook posts about the party, the drug court judge was requiring him to help with party setup tasks, adding that once the judge was satisfied

that he had assisted enough, she would release him before the party began. Starkgraf replied, "YOU ARE DISGUSTING PEOPLE WHO HAVE NO SOUL. I CAN USE SOCIAL MEDIA HOW I PLEASE." *Id.* The treatment court manager said Starkgraf ultimately came to the party early, but she did not think he completed what he was asked to do.

Later that day, Starkgraf emailed the treatment court manager to tell her that his urine would test positive for opiates, attaching pictures of a prescription for hydrocodone. The treatment court manager requested more documentation, so Starkgraf sent documents showing that earlier in the day, an emergency room physician had diagnosed him with "[a]cute right-sided low back pain" and had prescribed hydrocodone. Ex. 11. The "Social History" and "Past Medical History" sections of the physician's notes did not contain information about Starkgraf having substance use disorder or participating in drug court. *Id.*

After Starkgraf was remanded to jail as a result of the holiday party incident and the positive test, the drug court team held a Zoom panel with him to discuss their concerns. The treatment court manager testified that after the panel, the team felt that Starkgraf "had no insight into his actions or his part that he played in creating a lot of this stuff that could have been avoided." VRP at 57-58. Starkgraf's use of social media had been a problem in the past, and Starkgraf had committed to stopping because he knew he was using social media as a "way to vent, but not really get to the issue." VRP at 58.

Regarding Starkgraf's overall progress in the drug court program, the treatment court manager testified, "I think it's fair to say that at times people felt that he was slowly making progress." VRP at 59. She noted that to her knowledge, Starkgraf had only relapsed once, and the relapse occurred shortly after he entered drug court. She also noted that Starkgraf had completed drug and alcohol treatment. But she said that at some point, Starkgraf's progress fell, and she did

8

not believe there was anything more the team could do to help him. She noted that Starkgraf had accumulated 14 sanctions during his last 2 years in the program, as opposed to 10 in the first. Since entering phase 4, the final phase, in October 2020, Starkgraf had received sanctions for not disclosing employment and school changes within 24 hours, getting three separate speeding tickets, traveling outside the geographic restrictions that the drug court agreement imposed, and missing a urinalysis. Ex. 7, 8. When asked what progress she was looking to see, the treatment court manager said, "I'm not a treatment person, so what I'm looking for is compliance. . . . His treatment provider is the person who really can speak to his treatment progress." VRP at 67.

      2.      <u>Drug court counselors' testimony</u>

Starkgraf's most recent drug court counselor testified. He had worked with Starkgraf for "seven or eight months." VRP at 107. The drug court counselor said that when he began working with Starkgraf, Starkgraf was seeing him "once a month and was no longer required to attend any group sessions because he had done more than the requisite amount." VRP at 99. The drug court counselor was mainly focused on helping Starkgraf further his education. At the time of the hearing, Starkgraf was preparing to graduate from community college with an associate degree.

Regarding Starkgraf's recovery, the drug court counselor testified that Starkgraf had completed the drug and alcohol component of his overall drug court treatment plan. The drug court counselor said there was "no question that [Starkgraf] was committed to staying" sober, although he added that he "would have preferred to see more interaction with people in the local recovery community." VRP at 102-103. The drug court counselor said that in his time as Starkgraf's counselor, he did not suspect Starkgraf of relapsing.

A former drug court counselor also testified. He had worked with Starkgraf "for seven or eight months." VRP at 115. He had mainly focused on helping Starkgraf manage "any of the

9

stressors that he was having that could potentially lead to relapse, specifically around juggling work, school," and "drug court," and around experiencing racism as a person of color.[3] VRP at 117.

The former drug court counselor testified that at the time of the hearing, he thought Starkgraf had met all the requirements to graduate from substance use disorder treatment, and he never suspected Starkgraf of relapsing while working with him. He said that while Starkgraf was at one point "very active in the recovery community," involvement with Alcoholics Anonymous and Narcotics Anonymous eventually stopped being "his preferred method of recovery." VRP at 130. When asked if there was any other aspect of treatment he felt Starkgraf needed more work on, the former drug court counselor said, "I think at one point in time, it would have [benefited Starkgraf] to talk to . . . a mental health counselor, somebody that may have been a little bit more equipped to deal specifically with some of the other aspects of trauma not related to substance use disorder." *Id.*

3.      Starkgraf's testimony

Starkgraf testified that he had last relapsed in February 2019, approximately three years before the hearing. He said the drug court program gave him "the opportunity to turn [his] life around." VRP at 134. He said he would be graduating from community college in about two weeks with an associate degree "centered in science, transferable to a university for a [bachelor of science] degree." *Id.* He said he ultimately planned to get a master's degree.

---

[3] "One of the most significant predictors of positive outcomes for racial and ethnic minority participants in substance use disorder treatment is culturally sensitive attitudes on the part of the treatment staff, especially managers and supervisors." 1 NAT'L ASS'N OF DRUG CT. PROS., ADULT DRUG COURT BEST PRACTICE STANDARDS 15 (2018), https://allrise.org/wp-content/uploads/2023/06/Adult-Drug-Court-Best-Practice-Standards-Volume-I-Text-Revision-December-2018.pdf [https://perma.cc/5DRF-QSNP].

No. 57240-1-II

Regarding the prescription incident, Starkgraf testified that when he went to the emergency room to address his back issues, he told the physician that he was a drug court participant, that he had just left a drug court holiday party, and that his back was hurting because he had been required to lift tables. However, he did not tell the doctor that he had a history of abusing opiates. He said he did not ask the physician for a nonnarcotic medicine, explaining that he did not know he was supposed to do so.

B.      Ruling

After the parties presented their cases, the trial court concluded "that there was sufficient cause to justify termination from the drug court program" and that the State's "decision to seek termination was not unreasonable." CP at 44. The trial court found by a preponderance of the evidence that Starkgraf failed to continue making progress in treatment, filled a prescription without prior permission, was disrespectful to the drug court team and program during the holiday party incident, and "stagnated in the program by . . . languishing in an 18-month program for 40 months." CP at 43-44. The trial court found that the State had not proved by a preponderance of the evidence that Starkgraf had a high number of sanctions, explaining that it "had no information regarding what is considered a high number of sanctions comparatively." CP at 44.

The trial court then found that there were sufficient facts to find Starkgraf guilty of two counts of first degree trafficking in stolen property and convicted him.

III. SENTENCING

The drug court judge sentenced Starkgraf. During the sentencing hearing, the court explained the reasoning behind the termination decision:

> I think one of the issues that we had [as] you went through [drug court], it wasn't
> necessarily a concern about continued use, although how this ended[,] I was a little
> bit concerned that it ended the way we began; right? With prescription medication.
> But, it was more about you modifying some thinking behaviors that we work on in

11

> [drug court], and being able to accept some constructive criticism, right? Because we wanted you to be successful, we want you to be successful as you move forward in life, as well.

VRP at 160-61.

The defense asked for a sentence at the bottom of the standard range. Starkgraf's attorney explained that Starkgraf had been recently admitted to a university, and in light of the time he had already served, a low-end sentence would allow him to begin attending college on time.

The trial court followed the defense's recommendation and sentenced Starkgraf to a total of 6 months for each count running concurrently. The trial court reasoned that Starkgraf had made progress and that it did not want to prevent him from moving forward with his degree.

Starkgraf appeals the order terminating him from drug court, his convictions, and his judgment and sentence.

## ANALYSIS

"Adult drug courts are philosophically, functionally, and intentionally different from ordinary criminal courts." *State v. Sykes*, 182 Wn.2d 168, 171, 339 P.3d 972 (2014). They are "designed to be collaborative rather than adversarial," and we "view their practices with flexibility and, at times, tolerance for less formality." *State v. Harrison*, 24 Wn. App. 2d 40, 50, 519 P.3d 244 (2022). Adult drug courts approach treatment holistically, incorporating activities like "community service, educational sessions, and job training sessions" to help participants "adapt to a law-abiding lifestyle." Trent Oram & Kara Gleckler, *An Analysis of the Constitutional Issues Implicated in Drug Courts*, 34 IDAHO L. REV. 471, 478 (2006). Studies have shown that adult drug courts produced better outcomes when they helped participants "apply effective and prosocial decision-making skills, such as learning to think before they act, to consider the potential

12

consequences of their actions, and to recognize their own role in interpersonal conflicts." 2 NAT'L

ASS'N OF DRUG CT. PROS., ADULT DRUG COURT BEST PRACTICE STANDARDS 10 (2018).[4]

I. DRUG COURT TERMINATION PROCEDURE

Starkgraf argues that the procedure for terminating him from drug court violated his

procedural due process rights. Specifically, he argues that "the State failed to provide timely notice

of the alleged violations." Br. of Appellant at 21. And he argues that the "procedures at the

termination hearing . . . were utterly deficient," as the trial court should have evaluated the drug

court contract equitably to determine if the violations merited termination. *Id.* at 23. We disagree.

The Fourteenth Amendment to the United States Constitution and article I, section 3 of the

Washington Constitution forbid the State from depriving individuals of "life, liberty, or property,

without due process of law." U.S. CONST. amend. XIV, § 1; WASH. CONST. art. I, § 3. Under these

constitutional provisions, "when the State seeks to deprive a person of a protected interest," it must

give that person "adequate notice of the deprivation and a meaningful opportunity to be heard."

*State v. Beaver*, 184 Wn.2d 321, 336, 358 P.3d 385 (2015). "We review questions of law, including

constitutional due process guaranties, de novo." *State v. Lyons*, 199 Wn. App. 235, 240, 399 P.3d

557 (2017).

"Due process guaranties apply in drug court" termination proceedings. *Harrison*, 24 Wn.

App. 2d at 48. A drug court participant facing termination must be informed *before or during* the

termination hearing of the State's specific reasons for seeking termination. *Id.* at 50. The

participant must also be informed of their "right to contest the termination or the alleged violations

of the drug court agreement that supported termination," as well as their "right to an evidentiary

---

[4] https://allrise.org/wp-content/uploads/2023/06/Adult-Drug-Court-Best-Practice-Standards-Volume-2-Text-Revision-December-2018-corrected-May-2022.pdf [https://perma.cc/4LTR-C6J5].

hearing" with the burden of proof on the State. *Id.* at 51. Additionally, the participant is entitled to have the trial court determine by a preponderance of the evidence whether they violated the drug court agreement. *Id.* Finally, the trial court must make "written or oral findings clearly stating the evidence on which it relied in terminating" the participant. *Id.*

For example, in *Harrison*, we held that the procedure for terminating a defendant's participation in drug court "was deficient in four ways." *Id.* at 50. When the trial court informed the defendant of the drug court team's decision to seek termination, it "did not explain the specific reason" for the decision. *Id.* at 46. The State did not file a motion before the termination hearing, and the hearing itself lacked any discussion of the specific reasons behind the termination decision. *Id.* at 46-47. "The trial court suggested that the" drug court team's decision "was final and gave no indication that [the defendant] could challenge that decision." *Id.* at 51. The "trial court did not state at the . . . hearing that it had determined that [the defendant] had committed violations of the drug court agreement by a preponderance of the evidence with the burden of proof on the State." *Id.* And the trial court made no oral or written findings explaining what evidence it relied on when it terminated the defendant's participation in drug court. *Id.*

Here, the trial court's termination procedure comported with the due process requirements *Harrison* describes. Starkgraf was informed before the termination hearing of the State's specific reasons for seeking termination. Because Starkgraf hired an attorney to represent him at the termination hearing, we can infer that he was informed of his right to contest the termination and of his right to an evidentiary hearing, which occurred more than two months after Starkgraf was first informed that the State was seeking termination. Far from suggesting that the termination decision was unchallengeable, as the trial court did in *Harrison*, the trial court in this case heard evidence and argument from both sides. It continued the hearing to allow Starkgraf to present

14

testimony from a witness. At the end of the hearing, the trial court made oral findings of fact that explained which drug court violations the State had proved by a preponderance of the evidence, and the trial court reiterated those findings in writing. And the trial court's oral and written rulings clearly indicate that it relied on those violations to conclude "that there was sufficient cause to justify termination from the drug court program" and that the State's "decision to seek termination was not unreasonable." CP at 44.

Starkgraf points out that he did not receive a written motion stating the alleged bases for termination until the eve of the hearing. Especially where the State is taking the serious step of seeking termination, it would be preferable for the State to file and serve its written motion to terminate in compliance with the local rule requiring a written motion to be filed and served five days before a hearing. KITSAP COUNTY SUPER. CT. LOCAL CIV. R. 7(b)(1)(A). But here, Starkgraf had more than two months' notice that the State was seeking termination, and his counsel received information about the allegations from the assigned prosecutor. The State provided Starkgraf's counsel with discovery, including his sanction history and the documents the State planned to rely upon. Starkgraf's counsel did not identify any basis for termination in the State's motion that was a surprise in light of the documentation she received. Most importantly, our decision in *Harrison* did not require notice of all the specific reasons for termination in writing prior to the hearing. Instead, we found a due process violation because Harrison was never informed of the reasons for termination "before *or during*" the termination hearing. *Harrison*, 24 Wn. App. 2d at 50 (emphasis added). As we explained in *Harrison,* we tolerate less formality with respect to drug court proceedings. *Id.*

Starkgraf also argues that he did not receive all the documents the State relied upon before the hearing. Although defense counsel objected on the first day of the hearing to the admission of

15

exhibit 6, a packet of review hearing notes and decisions that counsel did not receive prior to the hearing, the court gave counsel time to review the packet and there was at least a week between the first and second days of the hearing. On the second day of the hearing, Starkgraf's counsel did not seek to recall any witnesses to inquire further about exhibit 6 or ask Starkgraf questions about that exhibit, which defense counsel could have done.[5]

In sum, there is no basis for us to hold that Starkgraf's procedural due process rights were violated.

## II. DRUG COURT TERMINATION DECISION

In arguing that we should reverse the order terminating his drug court participation, Starkgraf challenges the following findings of fact: that he failed to continue making progress in treatment and that he stagnated in drug court because he spent 40 months in the program. Regarding the first finding, Starkgraf argues that he remained sober throughout the program and participated actively "by working and going to school." Br. of Appellant at 25. Regarding the latter finding of fact, Starkgraf argues that the drug court contract does not specify a deadline for completing the program and that the 40-month time limit imposed by the drug court team was "purely arbitrary." *Id.* Starkgraf also contests the ultimate determination terminating his drug court participation. We disagree.

"When the State moves to terminate drug court participation, 'the burden is on the State to prove noncompliance with the agreement by a preponderance of the evidence.'" *State v. Varnell*, 137 Wn. App. 925, 929, 155 P.3d 971 (2007) (quoting *State v. Marino*, 100 Wn.2d 719, 725, 674

---

[5] Starkgraf's counsel also objected to exhibit 10, a urinalysis report that showed diluted creatinine levels, because counsel did not receive a copy before the hearing. But the trial court concluded that the defense opened the door to this evidence, and Starkgraf does not assign error to that decision on appeal.

P.2d 171 (1984)). If the trial court finds that the defendant breached the participation agreement, it then assesses the reasonableness of the State's termination decision in light of the facts. *Marino*, 100 Wn.2d at 725.

A.      Standards of Review

We review the trial court's findings of fact for substantial evidence. *See State v. Kessler*, 75 Wn. App. 634, 638-39, 879 P.2d 333 (1994) (applying "the usual standard" to findings of fact in a case involving termination of a sex offense diversion agreement because the "trial court's factfinding role [was] the same as in any other type of evidentiary hearing, whether it be a suppression hearing or a trial for breach of contract").

At oral argument, both parties argued that we should apply de novo review to the ultimate drug court termination decision. And courts reviewing drug court termination decisions have relied on *Kessler*, in which Division One undertook the same inquiry as the trial court when it reviewed the reasonableness of the State's decision to terminate a diversion agreement. *Id.* at 639. The *Kessler* court asked whether, in light of the facts, the State's decision to terminate was reasonable as a matter of law or as a mixed question of fact and law. *Id.* The court reasoned that this assessment "is analogous to the determination in a breach of contract case of whether a breach is material" and thus warrants "a remedy." *Id.* at 640-41. It further reasoned that separation of powers concerns warranted a degree of deference to the prosecutor's decision to seek termination, explaining that "diversion agreements are entered into and supervised by the prosecutor." *Id.* at 639.

But in *State v. Cassill-Skilton*, we distinguished drug court termination from diversion agreement termination. 122 Wn. App. 652, 657, 94 P.3d 407 (2004). We relied on the statute that previously gave counties the option to create drug courts "designed to achieve a reduction in recidivism and substance abuse . . . through early, continuous, and intense *judicially supervised*

17

*treatment*." Former RCW 2.28.170 (2002), *repealed by* LAWS OF 2015, ch. 291, § 11 (emphasis added). We reasoned that drug court termination is distinguishable because, rather than reviewing the prosecutor's termination decision, we "review the *actively supervised treatment* and evaluate the violations leading to the offender's termination." *Cassill-Skilton*, 122 Wn. App at 657 (emphasis added).

Although RCW 2.30.030, a different statute, now authorizes the establishment of drug courts, the *Cassill-Skilton* court's reasoning continues to apply because drug courts—unlike diversion agreements—involve long-term, significant judicial supervision. When a participant enters drug court, the trial court signs and is a party to their drug court agreement. The trial court then assumes responsibility for enforcing the agreement through rewards and sanctions. The participant regularly appears before the drug court judge, so the judge comes to know the participant well. And the entire drug court team, including the judge, develops a holistic understanding of the participant's treatment progress through meetings with treatment providers. These providers typically work for or contract with the trial court rather than the prosecutor's office.

While the prosecutor has the responsibility of moving for termination and proving noncompliance with the drug court agreement, the drug court *team* makes the decision to seek termination, and the trial court ultimately decides whether termination occurs. Even when the judge who presides over the termination hearing is not the drug court judge who is familiar with the participant, the trial court is in a better position than the appellate court to evaluate the termination decision's reasonableness, as that evaluation often requires credibility determinations about the participant and other witnesses. In the criminal context, abuse of discretion is the appropriate standard of review where the trial court's decision is "necessarily fact-specific" and

18

premised on an "in-person appraisal" of the defendant. *See In re Pers. Restraint of Rainey*, 168 Wn.2d 367, 375, 229 P.3d 686 (2010). We therefore review the trial court's drug court termination decision for abuse of discretion. "Abuse of discretion occurs when a decision is manifestly unreasonable or exercised on untenable grounds or for untenable reasons." *State v. Corbett*, 158 Wn. App. 576, 597, 242 P.3d 52 (2010).

B.      Findings of Fact About Treatment Progress and Program Stagnation

Starkgraf failed to comply with multiple drug court rules during the fourth and last phase of the program, even after he had been in the program for years. In the fourth phase, Starkgraf violated program rules by getting multiple speeding tickets, not disclosing employment and school changes within 24 hours, traveling outside of the geographic restrictions that the drug court agreement imposed, and missing a urinalysis. Ex. 8. In addition, just before the drug court team sought termination, he got a prescription for and took an opiate without first obtaining permission from staff, gave a urine sample with low creatinine levels, and changed residences, leaving his sober housing without informing the drug court team. The treatment court manager testified that while "at times people felt that he was slowly making progress," toward the end his progress fell, and there was nothing more the team could do to help him. VRP at 59.

Two witnesses who had treated Starkgraf for substance use disorder both testified that Starkgraf was successful in drug and alcohol treatment. They both testified that he had demonstrated a prolonged commitment to abstinence from narcotics. As the trial court recognized, Starkgraf had many other accomplishments while in the program, such as volunteering, working, and almost finishing his associate degree.

However, drug courts approach treatment broadly. Beyond requiring participants to abstain from narcotics, drug courts require participants to follow the law in general and "apply effective

19

and prosocial decision-making skills." 2 NAT'L ASS'N OF DRUG CT. PROS., *supra*, at 10. The number of rules Starkgraf violated toward the end of his time in the program demonstrated ineffective decision-making skills in the context of a structured program with rewards and sanctions. And two of the violations that prompted the drug court team to seek termination put Starkgraf's commitment to abstinence from narcotics in question: he obtained an opioid without drug court permission and gave a urine sample with low creatinine levels. Thus, there is substantial evidence in the record to support the finding that Starkgraf's progress in treatment had stalled.

Moreover, for the same reasons, substantial evidence supports the finding that Starkgraf stagnated in drug court. Although Starkgraf's compliance specialist testified that participants typically take 2 years to complete the program, Starkgraf had been in the program for 40 months, and he delayed his graduation date by breaking multiple rules toward the end of his time in the program. Starkgraf asserts that we must reverse this finding because there was no statement in the drug court agreements that required graduation within a certain amount of time. But the list of phase four violations recited above, including the violations Starkgraf committed in the late stages of his drug court participation when he was otherwise ready for graduation, independently support the finding that Starkgraf stagnated. To show stagnation, the State did not need to prove that Starkgraf separately violated a drug court agreement by spending 40 months in the program without graduating.

C.    Termination Decision

Finally, the trial court did not abuse its discretion by terminating Starkgraf's participation in drug court. As explained above, Starkgraf filled a prescription for an opioid and took the medication without prior permission, and he stagnated in the program by delaying his graduation through multiple violations of his drug court agreement. These grounds show that Starkgraf was

20

not making progress toward graduation despite spending 40 months in the program. Under these circumstances, the trial court did not make the termination decision on untenable grounds, even though Starkgraf's violations did not rise to the level of relapse or reoffense.

### III. FIRST AMENDMENT

Starkgraf argues for the first time on appeal that the trial court violated his First Amendment right to free speech by finding that his criticism of the drug court program on social media broke the program's rules. He argues that this error was manifest under RAP 2.5(a)(3) because the termination "order was based in part on the allegations that [his] protected speech was disrespectful to [the] court and the program." Br. of Appellant at 29. The State responds that Starkgraf "cannot show manifest constitutional error" because even if we were to hold that the trial court could not consider Starkgraf's Facebook posts on remand, a different result would be unlikely. Br. of Resp't at 21. We agree with the State.

We "may refuse to review any claim of error [that] was not raised in the trial court." RAP 2.5(a). But a party may raise a "manifest error affecting a constitutional right" for the first time on appeal. *Id.* The "appellant must demonstrate (1) the error is manifest and (2) the error is truly of constitutional dimension." *State v. O'Hara*, 167 Wn.2d 91, 98, 217 P.3d 756 (2009). "Stated another way, the appellant must 'identify a constitutional error and show how the alleged error actually affected the [appellant]'s rights at trial.'" *Id.* (alteration in original) (quoting *State v. Kirkman*, 159 Wn.2d 918, 926-27, 155 P.3d 125 (2007)).

Here, we decline to review Starkgraf's claim of error because he has not shown how the alleged error actually affected his rights at the drug court termination hearing. Aside from finding that Starkgraf disrespected the drug court team and program, the trial court found that Starkgraf failed to continue making progress in treatment, filled a prescription for an opiate without prior

21

permission, and stagnated in the drug court program. The latter findings alone supported termination. In order to function, drug courts must be able to discharge participants who, after being provided with sufficient opportunities to make mistakes and learn from them, have stopped making progress, whether that lack of progress stems from difficulty with drug and alcohol treatment or difficulty abiding by drug court program rules. Thus, Starkgraf has not shown that the trial court was likely to have reached a different result if it had not considered his statements about the holiday party.

Given that Starkgraf has not demonstrated that the alleged constitutional error affected the outcome here, it is not a manifest error, and we decline to review it.

CONCLUSION

We affirm.

_____
Glasgow, C.J.

We concur:

_____
Veljacic, J.

_____
Price, J.